UNITED STATES of America, Plaintiff,

v.

Fred B. FONTANA, Virginia Fontana, Great Lakes Carbon Corporation and the Sheriff of Westchester County, Defendants.

GREAT LAKES CARBON CORPORATION, Plaintiff,

v.

Fred B. FONTANA, Virginia Fontana, Material Handling Consultants, and The United States of America, Defendants.

Nos. 80 CIV 1527 (LBS), 80 CIV 4105 (LBS).

United States District Court, S. D. New York.

Oct. 13, 1981.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., J. D. Pope, Asst. U. S. Atty., New York City, for plaintiff.

Butler, Fitzgerald & Potter, Stuart Potter, David K. Fiveson, New York City, for Great Lakes Carbon Corp.

Dennis M. Fox, White Plains, N. Y., for Fred B. Fontana, Virginia Fontana and Material Handling Consultants.

Samuel S. Yasgur, County Atty., County of Westchester, White Plains, N. Y., for Sheriff of Westchester County; Brian Powers, White Plains, N. Y., of counsel.

## OPINION

SAND, District Judge.

The United States has, by order of this Court dated July 8, 1981, obtained a judgment against the Fontanas in the amount of $102,404.92. The underlying debt which gives rise to this judgment represents unpaid federal income taxes owed for the years 1974 and 1975, plus statutory additions, interest and penalties.

Prior to obtaining judgment, the United States attempted to levy upon a fund of money held by the Sheriff of Westchester County which money, the Government contends, belongs to the Fontanas. The Sheriff has refused to relinquish the fund because it is subject to a competing claim asserted by Great Lakes Carbon Corporation ("Great Lakes"). Great Lakes is the former employer of Fred Fontana, and it has asserted, in prior litigation in state court and in a currently pending action removed from state court and consolidated with this proceeding, that the fund in question is traceable to wrongful acts by Fontana in breach of his fiduciary obligations as an employee and that such fund should be found to be held in constructive trust for the benefit of Great Lakes. Great Lakes disputes the Government's claim to priority of lien over the fund on the grounds that the taxpayers were not the beneficial owners of the fund but held bare legal title for the benefit of Great Lakes. *See Aquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

The Government now moves for summary judgment, and Great Lakes moves for an order directing that an inquest be held to determine whether such a constructive trust exists.

## I. Subject Matter Jurisdiction

Initially, this Court must address the question of subject matter jurisdiction. In its Memorandum of Law at pp. 8–12, the Government argued that the expiration of the time within which Great Lakes could sue the Government for wrongful levy deprives this Court of subject matter jurisdiction over Great Lakes' claim to the Fontana fund. Although the Government has since withdrawn its argument at the request of the Internal Revenue Service, letter of J. D. Pope, Assistant United States Attorney, dated June 11, 1981, the Court is nevertheless compelled to consider the issue because it raises a question of subject matter jurisdiction, not waivable by the parties. *See* Fed.R.Civ.P. 12(h).

Prior to the enactment of I.R.C. § 7426(a)(1), sovereign immunity, which bars suit against the Government except to the extent that the Government has consented, prevented persons other than the taxpayer from suing the Government to recover their property after the Government had wrongfully levied upon it in satisfaction of the taxpayer's liability. *United Sand & Gravel Contractors, Inc. v. United States*, 624 F.2d 733, 739 (5th Cir. 1980) (citing S.Rep.No.1708, 89 Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 3722, 3750–55). The nine month limitation period governing § 7426, I.R.C. § 6532(c), represents the legislative definition of the extent of the sovereign's consent to suit. *Id.* Thus, the Court would lack subject matter jurisdiction over an action pursuant to § 7426(a)(1) commenced more than nine months after the cause of action accrued.

The United States and Great Lakes disagree as to whether the cause of action ever accrued. They raise the issue whether a levy actually occurred when the IRS served notice of levy on the Sheriff in November, 1977. The United States argues that service of notice of levy upon the person in possession of the property constitutes a

levy. Great Lakes argues that the Government is merely stating the general rule, to which there is an exception when the property is *in custodia legis.* Great Lakes Memorandum at 18–23. Neither party cites authority directly dealing with this issue. But it is not necessary to determine whether in fact a levy took place, and therefore this Court refrains from deciding this unclear issue.

■ The jurisdictional issue is simply resolved by the recognition that Great Lakes is not attempting to sue the United States. In one of the two cases presently before the Court, Great Lakes is suing the Fontanas to recover property it alleges they wrongfully hold. The Government has intervened in that proceeding on the ground that its rights to the Fontana fund might be impaired thereby. In the second action, the Government is suing Great Lakes, the Fontanas, and the Sheriff to enforce its claimed levy on the fund. Great Lakes is not availing itself of the wrongful levy remedy provided by § 7426(a)(1), so the nine month's limitation is irrelevant. The Government stated, however, that "the remedy provided by section 7426, which in effect waives the sovereign immunity of the United States in cases where third persons are challenging the propriety of tax levies, is exclusive. *United Sand & Gravel Contractors, Inc. v. United States,* 624 F.2d 733, 739 (5th Cir. 1980)." Government Memorandum at 9. But more accurately, § 7426 is the third person's "exclusive remedy *against the United States.*" 624 F.2d at 739 (emphasis added). When the property is in the hands of a nongovernmental party, other remedies may be available. *Id.* For example, in *World Marketing, Ltd. v. Hallam,* 608 F.2d 392 (9th Cir. 1979), the alleged owner of a sailing vessel levied upon and sold by the Government in satisfaction of a taxpayer's liability had sued the transferee of the vessel to quiet title. Reversing the district court's determination that I.R.C. § 7426 was the exclusive remedy for property wrongfully seized and sold by the United States, the court found that the alleged owner could seek a state law remedy against the transferee. *Id.* at 394–95. In *Crow v. Wyoming Timber Products Co.,* 424 F.2d 93, 96 (10th Cir. 1970), the court held that the suit for replevin against the purchaser of timber at a tax sale originally brought in state court by the alleged owner of the timber was not merely a concealed § 7426 action, and therefore not removable to federal court. The court noted that although § 7426 was the exclusive remedy against the United States, "nothing in § 7426 purports to cover" a suit against the purchaser in a federal tax sale, and remanded the case to the state court. *Id.*

■ The Government presented no theory explaining how a nongovernmental entity could cloak itself in sovereign immunity. The fact that Great Lakes' right to sue the Government may have expired does not mean that its property rights arising under state law have expired and that the Sheriff is now obligated to surrender the property to the Government despite the corporation's competing claim. A statute of limitations governs the time in which a particular remedy may be sought in court, not the underlying rights, which may command other remedies. *United States v. Studivant,* 529 F.2d 673, 675 (3d Cir. 1976). Section 6532(c) and § 7426(a)(1), taken together, do not reveal any legislative purpose to foreclose other avenues of relief or to extinguish underlying rights.[1]

■ The vindication of Great Lakes' property rights, which are the subject of its litigation, does not depend upon the availability of a remedy against the Government. The property in question remains in the possession of the Sheriff, in accordance with I.R.C. § 6332(a), which exempts him

---

1. The Fifth Circuit has stated that the purpose of § 6532(c) is to protect the interests of the United States after it has credited seized property to the taxpayer's account; in the event of a successful § 7426(a) suit, the Government would be forced to look to other assets of the taxpayer, and would be prejudiced by the passage of time. *United Sand & Gravel Contractors, Inc. v. United States,* 624 F.2d 733, 739 (5th Cir. 1980). This consideration is not present in the instant case.

from the obligation to surrender property subject to levy while it is "subject to an attachment or execution under any judicial process."[2] If at the close of this litigation, Great Lakes were adjudged the beneficial owner of the fund, or some portion of it, the Sheriff would release the fund to Great Lakes.[3] At that point, it would be clear that the Government's lien could not have attached, since the lien can only attach to the taxpayer's property. The Government's only argument that Great Lakes would then be forced to use § 7426(a)(1) would be that even though no lien could have attached, and thus its levy—assuming a levy has occurred—is known to have been wrongful, the Court should nevertheless enforce a wrongful levy and order the disposition of the fund to the Government. Clearly, there is a difference between the Government's inadvertently levying on a third person's property without the aid of any court and a court's enforcing what it knows is a wrongful levy on property it has adjudged to belong to another. The Court is not compelled to do wrong simply because it could no longer remedy the wrong if it had occurred in the past. Therefore, the Court finds that § 7426(c) is not Great Lakes' exclusive means to recover its property and that sovereign immunity does not deprive the Court of jurisdiction over Great Lakes'

suit for a state law remedy against the Fontanas.

The only real issue remaining[4] upon which the appropriateness of summary judgment depends is whether the Fontanas had a sufficient interest in the fund to which the Government's tax lien could have attached.

## II. Ownership of the Fontana Fund

### Great Lakes Claim

The history of the Great Lakes' state court litigation is somewhat complex. For these purposes, however, it suffices to note that the first action was commenced by Great Lakes on May 16, 1975. This action was discontinued by stipulation entered into between Great Lakes and the Fontanas on June 17, 1975. However, on June 20, 1975, Great Lakes commenced a second action against the Fontanas and a corporation they controlled, alleging the same basic allegations they had previously asserted in the initial action, plus a claim that the stipulation discontinuing that action had been fraudulently induced. On April 25, 1978, Great Lakes moved for judgment by default on the grounds that the Fontanas had wilfully failed to obey certain disclosure orders of the court and on September 5,

---

2. I.R.C. § 6332(a) reads in pertinent part:

 [A]ny person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary or his delegate, surrender such property or rights (or discharge such obligation) to the Secretary or his delegate, *except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.* (emphasis added).

 It is on the basis of this section that Great Lakes argues no levy has taken place. Great Lakes' Memorandum at p. 23.

3. This result would only obtain if Great Lakes succeeds on its constructive trust theory, see pp. 143–46, *infra.* A constructive trust should be distinguished from a judgment for damages, which would only give Great Lakes a judgment lien as of the date of the judgment. A judgment lien subsequent to the Government's tax lien would be inferior to the tax lien. *See* p. 142, *infra.*

4. Great Lakes previously contended that the Government's tax notices were defective because they were not filed in Texas, the state in which the Fontanas had taken up residence in June, 1976. Affidavit of Stuart L. Potter, counsel for Great Lakes, ¶ 13, p. 8. It appears, however, from the affidavit of Robert M. McKeever, district director of Internal Revenue Service at Austin, Texas, that in addition to notices which had been filed with the County Clerk of Westchester County, New York, notices of federal tax lien were filed with the County Clerk in Hays County, Texas, on February 3, 1978 in the amount of $79,857.94 and on April 25, 1978 in the amount of $78,306.54. McKeever affidavit, ¶ 3. Thus, Great Lakes cannot and does not claim that notices of tax lien were not filed in the county of residence as required by I.R.C. § 6323(a), although it does contend that the notices were insufficient to cover all of the Government's present claims. *See* fn. 5 *infra.*

1978, the Supreme Court issued an order which awarded Great Lakes judgment against Mr. Fontana in the sum of $31,-997.03, plus interest, costs and disbursements, and granted other relief, including a direction that an inquest be held for the purpose of enabling Great Lakes to establish its damages on various causes of action asserted by it. On September 18, 1978, a formal judgment in the amount of $38,-460.42 on Great Lakes' third cause of action was filed in the County Clerk's Office in New York County. Potter Affidavit, ¶ 19–20. By order entered May 1, 1980, the Supreme Court of New York County ordered that the inquest be held to ascertain the damages in the action in which the Fontanas had defaulted. It is this action which was removed to this Court on application of the United States, which intervened in the state court action asserting a claim to the fund. And it is that proceeding (80 Civ. 4105 (LBS)) in which Great Lakes seeks an order setting a date for the inquest which the state court had ordered.

In December, 1975, in connection with the claims it was pursuing against the Fontanas in state court, Great Lakes obtained two orders of attachment against the assets of the Fontanas. "Pursuant to the first order of attachment, the Sheriff of Westchester County levied upon and reduced to possession $78,131.39 contained in the bank accounts of the Fontanas and M.H.C. [the Fontanas' corporation] at the National Bank of Westchester." Potter Affidavit, ¶ 14, p. 8.

As noted, fn. 4, *supra*, the Government filed its notices of tax liens in Texas in February and April of 1978. Its notice is thus some three years subsequent to the Great Lakes' December 1975 attachment.

It is, however, prior to the September 1978 judgment against the Fontanas, obtained by Great Lakes in the state court.

■ The Government asserts and the law is clear that an attachment lien is subordinate to a tax lien, because an attachment lien is contingent and inchoate and therefore insufficient to defeat a choate federal tax lien. 26 C.F.R. ¶ 301.6323(h)–(1)(g), *United States v. Acri*, 348 U.S. 211, 213–14, 75 S.Ct. 239, 241, 99 L.Ed. 264 (1955). Great Lakes has never obtained execution on its judgment. The Government urges that under both federal and state law, its prejudgment attachment does not give rise to a specific, presently enforceable lien.

The Government asserts that, viewing Great Lakes' case in its most favorable light, that is, assuming the September 1978 default judgment had been perfected, the priority question posed by this case would be: "[W]hether a tax lien of the United States is prior in right to an attachment lien where the federal tax lien was recorded subsequent to the date of the attachment lien but prior to the date the attaching creditor obtained judgment." *United States v. Security Trust & Savings Bank*, 340 U.S. 47, 48, 71 S.Ct. 111, 112, 95 L.Ed. 53 (1950); *see also United States v. Acri*, 348 U.S. 211, 213, 75 S.Ct. 239, 241, 99 L.Ed. 264 (1955). In both of these cases, the Supreme Court has answered the question by ruling that the federal tax lien has priority.[5]

Although Great Lakes cannot have had any lien prior to the Government's tax lien, using a constructive trust theory, Great Lakes could show that the Government has no lien because the fund was the property of Great Lakes and not the taxpayer.

5. Great Lakes contends that the Texas filings are inadequate to cover the Government's full claim because they are for less than the Government's judgment ($102,404.92). Great Lakes alternatively contends, therefore, that it should be awarded priority to the extent to which the Government's Texas filings are exceeded in amount by the fund held by the Sheriff. The Government, however, notes that the amount covered by the notices it filed in Texas were for the principal amount of the unpaid balance of assessment ($79,857.94), the January 31, 1978 filing, and $78,306.54 in the April 20, 1978 filing, both of which filings were for the amount of taxes "together with penalties, interest, and costs that may accrue in addition thereto." It is these latter items which account for the difference between the amounts specified in the tax notices filed and the amount of the Government's judgment. Great Lakes' contention is therefore without merit and is rejected.

*Constructive Trust Theory*

 A tax lien creates no property rights in itself. *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960). Federal law merely determines the priority of liens once the federal tax lien attaches. *Id.* But whether the tax lien has attached depends on the state law question of ownership, since the lien can only attach to property that the taxpayer owns. When title to property is bifurcated, so that the taxpayer owns mere legal title and serves as the trustee for the benefit of a third party, the taxpayer's interest is insufficient for the tax lien to attach. *Id.*

 In *Aquilino v. United States,* 10 N.Y.2d 271, 219 N.Y.S.2d 254, 176 N.E.2d 826 (1961), the New York Court of Appeals, deciding the question of state property law on remand from the Supreme Court, found a direct trust created by statute to protect the interests of subcontractors in funds in the hands of general contractors. In the present case, the Court is presented with no New York statute expressly creating a trust, but the same bifurcation of title occurs in a constructive trust and would deprive the taxpayer of sufficient property interest for a tax lien to attach. A constructive trust is not a true trust: it is not intended, but it is treated as if it were intended, to avoid unjust enrichment; and it does not impose extensive fiduciary duties on the trustee, but only the duty to make restitution. 5 Scott, Trusts [3d ed.] § 462.4. It is, however, analogous to a trust with respect to the bifurcation of title: .4 Pomeroy's Equity Jurisprudence § 1044 (1941).

The crucial question in determining whether the Government is entitled to summary judgment is: when does a constructive trust arise? For unless the bifurcation of title, if a constructive trust should be *found to exist,* would have preceded the

attachment of the federal tax lien, the Government must prevail. The parties present two different theories.

Great Lakes' analysis of the constructive trust theory is as follows: the Fontanas hold bare legal title to the fund; the corporation owns the beneficial title and the right to compel the Fontanas to convey legal title to it, which would unify the bifurcated title; the Government's tax lien, capable of attaching only to the taxpayers' property, never attached to the property beneficially owned by the corporation. Therefore, the disposition of the fund depends upon the unresolved question whether the fund is subject to a constructive trust, and the Government's motion for summary judgment must be denied.

The Government contends that a constructive trust is merely a remedy imposed by a court, and does not exist until a court declares it to exist. Its analysis produces a different result: since no court has yet imposed the remedy, no bifurcation of legal and equitable title has taken place;[6] and the Fontanas possessed a sufficient property interest to which the tax lien attached. Since the tax lien attached, the Government argues, no subsequent action divesting the Fontanas can defeat the Government's claim to the fund, and it is entitled to summary judgment.

The Government cites numerous cases, none of which directly states that a constructive trust arises only when a court declares its existence. It relies entirely on the interpretation of language selected from a case in which the outcome did not depend on the timing of the bifurcation of title. It quotes the seminal New York case written by Judge Cardozo, *Beatty v. Guggenheim Exploration Co.,* 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (*citing Moore v. Crawford,* 130 U.S. 122, 128, 9 S.Ct. 447, 448, 32 L.Ed. 878 (1888)): "When property

---

**6.** The illogic of the Government's position appears at this point in the Government's scheme: "the trust, if and when it is obtained, conveys legal title and beneficial interest from the 'trustee' to the beneficiary—but until the court adjudges a constructive trust legal title

and beneficial interest are with the person holding the property." Reply Memorandum at p. 11. But if legal and beneficial title are never in two different persons, there would be no reason to use the trust analogy.

has been acquired in such circumstances that the holder of legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." The Government emphasizes the word "retain" and concludes: "the trustee has title, but he may not retain it—through the remedy of a constructive trust the court finds and enforces an 'equitable duty' to convey that title." Government's Reply Memorandum at 11. But the meaning of even this quotation is susceptible to another interpretation. Judge Cardozo wrote that *"equity* converts [the holder of legal title] into a trustee." (emphasis added), not that the *court* of equity converts him into a trustee. The word "equity" connotes broad principles of fairness and justice. *See Simonds v. Simonds*, 45 N.Y.2d 233, 239, 380 N.E.2d 189, 192, 408 N.Y.S.2d 359, 362 (1978). This connotation indicates that it is the circumstance of unfairness which causes the bifurcation of title.[7]

Other language in *Beatty* itself supports this view. Judge Cardozo, analyzing the facts of that case, wrote that an excessive payment procured by the plaintiff "was a breach of the plaintiff's duty to his employer. The payment, thus unlawfully swollen, was subject to a constructive trust." He did not write that the breach compelled the *court* to create a constructive trust. In addition, he wrote that the *employer*, not the court, faced with a contract made in breach of the employee's fiduciary duties, "would have the right, *if he so elected*, to hold the plaintiff as trustee." *Id.* at 385, 122 N.E. at 380 (emphasis added) (the employer might instead consent to the contract). Taken as a whole, *Beatty* does not support the Government's interpretation. The rest of the Government's citations merely point to repetitions of Judge Cardozo's language.

Other New York cases support Great Lakes' interpretation. In cases in which the New York Court of Appeals has found a legatee involved in fraud or misdoing obligated to turn property over to the testator's intended beneficiary, the court has repeated that the constructive trust "acts upon the gift itself *as it reaches* the possession of the legatee, or *as soon as* he is entitled to receive it." *Trustees of Amherst College v. Ritch*, 151 N.Y. 282, 324, 45 N.E. 876, 887 (1897) (emphasis added), *quoted in Latham v. Father Divine*, 299 N.Y. 22, 30, 85 N.E.2d 168, 172 (1949); *Ahrens v. Jones*, 169 N.Y. 555, 561, 62 N.E. 666, 668 (1902).[8] In that context, the court has indicated that a constructive trust, similar to an express trust, "springs from the intention of the testator and the promise of the legatee," *Trustees of Amherst College v. Ritch*, 151 N.Y. at 323, 45 N.E. at 887, *quoted in Ahrens v. Jones*, 169 N.Y. at 561, 62 N.E. at 668, and not from any act of the court.

In *Coane v. American Distilling Co.*, 298 N.Y. 197, 81 N.E.2d 87 (1948), the Court of Appeals discussed the constructive trust remedy in the context of a shareholder derivative suit in which directors were charged with misappropriation of corporate assets and opportunities. The court spoke of bifurcation of title preexisting any court decree: "While legal title [to the misappropriated property] is in the individual defendants, the res actually belongs, by operation of law, to American Distilling." *Id.* at 206, 81 N.E.2d at 90. The intervention of the court of equity was essential to "strip the individual wrongdoers of specific property and to decree its restitution to its

---

7. This conclusion would similarly flow from the Restatement's wording of the same concept: "Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a construct trust arises." Restatement of Restitution § 160 (1936), *cited by Simonds v. Simonds*, 45 N.Y.2d 233, 242, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 364 (1978).

8. In these cases, the Court was faced with the problem of overriding the policy of the statutory requirement that wills be executed with certain formalities. The Court resolved the problem by first giving effect to the will and then, to avoid unjust enrichment, finding the legatee obligated to turn over the legacy to the intended beneficiary. Thus, it should be noted that the timing issue dealt with in these cases differed from the one presented in the instant case.

proper and equitable owner." *Id.* In other words, the court's role is to specifically enforce the trust, not to create it.[9]

The New York State Court of Appeals' most extensive recent discussion of constructive trusts appeared in *Simonds v. Simonds*, 408 N.Y.2d 233, 380 N.E.2d 189, 408 N.Y.S.2d 359 (1978). In this case, a finding of constructive trust required the second wife of a decedent to pay the proceeds of life insurance policies, in which the second wife had been the named beneficiary, to the decedent's first wife. The second wife's equitable duty arose out of the decedent's breach of a promise, contained in his separation agreement with his first wife, to maintain certain insurance policies naming the first wife as beneficiary. The court noted that the first wife was not limited to her now worthless legal right against her former husband, but "due to the husband's failure to do what he should have done [she] . . . also [had] an equitable right in the policies, a right which, upon the husband's death, attached to the proceeds." *Id.* at 240, 380 N.E.2d at 193, 408 N.Y.S.2d at 363. Significantly, the court reached the proper-

ty that the husband wrongfully diverted from the first wife in the hands of the second wife who was innocent of any wrongdoing, applying the traditional equitable principle: "equity regards as done that which should have been done." *Id.*, 380 N.E.2d at 193, 408 N.Y.S.2d at 362.[10]

In the case at hand, if Great Lakes' allegations are proven, the same principle would direct regarding the money in the Fontana fund as the property of the corporation as of the time of Fontana's wrongful act. Moreover, equitable principles in general urge this result. The Government's argument is intended to achieve a result which is fundamentally unfair: to seize property that, should Great Lakes prevail on the merits in its underlying claim, good conscience would convey to Great Lakes. It is this Court's opinion that the New York Court of Appeals would reject such a result. That court recently affirmed the traditional importance of equity in avoiding injustice and stated that "to evolve formalisms narrowing the broad scope of equity is to defeat its purpose."[11] The Government's ar-

---

**9.** The Court cites, 298 N.Y. at 206, 81 N.E.2d at 90, the Restatement of Restitution § 160 (1936), Comment e of which reads:

"Where property is held by one person upon a constructive trust for another, the latter has the beneficial interest therein. In many cases the beneficiary of the constructive trust can by a proceeding in equity compel the transfer of the property to him in specie; he is entitled to specific enforcement of the constructive trust."

The Restatement terminology seems to be an accurate statement of what courts usually reduce to the shorthand "the court impresses (or imposes) a constructive trust," when the issue of timing is not relevant. The Restatement notes that the constructive trust may exist in some cases and nevertheless be unenforceable because the beneficiary's remedy at law is adequate. *Id.* at Comment f. Clearly, then it is the enforcement and not the creation of the constructive trust that comes from the court.

**10.** The *Simonds* court cites 2 Pomeroy, Equity Jurisprudence [5th ed.] § 364, for this principle. Pomeroy elaborates, *id.* at § 375:

"The principle is no less truly and directly the source of the equitable ownership regarded as held by the beneficiary in all trusts which arise by operation of law . . . ." Although there is no express trust "yet by the settled doctrines of the equity jurisprudence,

an equity exists between the parties which is treated as worked out; an obligation to convey the subject-matter rests upon the holder of the legal title, which is treated as though performed." A constructive trust is seen only as an analogy to a trust but that view "does not deny, and was not intended to deny, the existence of the real, equitable property in the beneficiary. He is admitted to be the equitable owner, with all the incidents of ownership, although the legal title is vested in another person. The beneficiary may not have anything which the law requires as a 'title,' he may be without written evidence of his right, his proprietorship may rest wholly upon acts and words, but still he is the equitable owner because equity treats that as done which in good conscience ought to be done."

**11.** 45 N.Y.2d at 238, 380 N.E.2d at 192, 408 N.Y.S.2d at 361–62, the Court states:

"Born out of the extreme rigidity of the early common law, equity in its origins drew heavily on Roman law, where equitable notions had long been accepted (see 1 Pomeroy, Equity Jurisprudence [5th ed.], §§ 2–29). 'Its great underlying principles, which are the constant sources, the never-failing roots, of its particular rules, are unquestionably principles of right, justice, and morality, so far as

gument is just such an attempt to narrow the reach of equity. If the law in this area is unclear, this Court should interpret New York law as would produce an equitable result.

The most direct statement of when a constructive trust arises appears in 5 Scott, Trusts [3d ed.] § 462.4 ("At what time the constructive trust arises").[12] Professor Scott is absolutely clear: "Where the title to property is acquired by one person under such circumstances that he is under a duty to surrender it, a constructive trust immediately arises. . . . It would seem that there is no foundation whatever for the notion that a constructive trust does not arise until it is decreed by a court. It arises when the duty to make restitution arises, not when the duty is subsequently enforced." *Id.* The indisputable fact that the defrauded person can reach the property in the hands of a transferee, *see Simonds v. Simonds*, 45 N.Y.2d 233, 242, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 364 (1978), unless the transferee is a bona fide purchaser, demonstrates that "[t]he beneficial interest in the property is from the beginning in the person who has been wronged." 5 Scott, Trusts [3d ed.] § 462.4. It is a misunderstanding of the word "constructive" to think that the court "constructs" rather than "construes" a trust. *Id.* Cf. *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 388, 122 N.E. 378, 381 (1919) (questioning whether the circumstances demand the Court's "implication" of a trust). The court thus construes—or interprets—the circumstances and finds that "some of the consequences which would follow from the creation of·an

express trust should also follow." 5 Scott, Trusts [3d ed.] § 462.4.

■ This Court therefore finds that New York law holds a constructive trust to exist from the time of the occurrence of the circumstances giving rise to the duty to surrender the property in question to another.

## Conclusion

■ The question of fact whether Fontana's acts gave rise to a constructive trust for the benefit of Great Lakes remains unsettled. The validity of the Government's tax lien depends on whether the Fontanas had a sufficient property interest in the fund, which they lack if a constructive trust is found. The Government's claim upon the fund, therefore, cannot be determined without a hearing on the merits. Accordingly, the Government's motion for summary judgment is denied.

The Court will hold a pre-trial conference on November 2, 1981 at 9:30 A.M. to deal with the scheduling of further proceedings herein.

SO ORDERED.

the same can become the elements of a positive human jurisprudence' (id., § 67, at p. 90). Law without principle is not law; law without justice is of limited value. Since adherence to principles of 'law' does not invariably produce justice, equity is necessary (Aristotle, Nichomachean Ethics, Book V, ch. 9, pp. 1019–1020 [McKeon, ed. Oxford: Clarendon Press, 1941]). Equity arose to soften the impact of legal formalisms; to evolve formalisms narrowing the broad scope of equity is to defeat its essential purpose."

12. Although no New York case has cited this subsection, the New York Court of Appeals frequently refers to Scott. See, e.g., Simonds

v. Simonds, 45 N.Y.2d 233, 242, 380 N.E.2d 189, 194, 408 N.Y.S.2d 359, 364 (1978); Coane v. American Distilling Co., 298 N.Y. 197, 206, 81 N.E.2d 87, 90 (1948). It is likely that the New York Court, if faced with a problem similar to the one before this Court, would look to Scott for guidance, particularly since Scott's view represents the established tradition in the field (Professor Scott was an author of both the Restatement of Restitution and the Restatement of Trusts), and the New York Court's recent decisions such as Simonds disclose no trend toward restricting the traditional law of constructive trusts.