In re Joseph Douglas **SHEPARD**, a/k/a James F. Martin, Debtor.

**CENTRAL TRUST COMPANY, a New York banking corporation, Plaintiff,**

v.

Joseph Douglas **SHEPARD**, a/k/a James F. Martin and Victor E. Raymos, not individually, but only as Trustee, Defendants.

**Bankruptcy No. 82–355–BK–J–GP. Adv. No. 82–486.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

May 16, 1983.

929

Douglas P. McClurg, Jacksonville, Fla., for plaintiff.

Victor E. Raymos, Jacksonville, Fla., for trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This action was tried before the Court on April 21, 1983. Based upon the evidence presented and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Plaintiff, Central Trust Company, a New York banking corporation ("Central"), sued defendants, Joseph Douglas Shepard, a/k/a James F. Martin ("Shepard") and Victor E. Raymos, not individually, but only as Trustee ("Trustee"). A default was duly entered against Shepard for failure to file any pleadings or papers as required by law and the Trustee duly answered the complaint.

2. In mid-November, 1981, Shepard contacted David Milliman, an officer of Central and told him that he was engaged in a new business venture, JDS Marketing, Inc. ("JDS"), to sell computer programs to consumers at a cost of between $50 and $250.

3. A standard merchant servicing agreement was entered into by Shepard and Central which allowed Shepard to deposit MasterCharge and VISA charge slips into his account and receive instantaneous credit in the face amount of the slips.

4. On November 11, 1981, a checking account was opened at Central in the name of JDS, and within a few days Shepard began depositing charge slips into the account.

5. Between November 19, 1981, and December 7, 1981, a period of about 20 days, Shepard deposited into the account charge slips totaling approximately $274,000.

6. Between November 20, 1981, and December 11, 1981, roughly the same time frame, Shepard withdrew from the account cash totaling approximately $250,000.

7. Approximately four days after the last withdrawal, the unusually heavy activity in the JDS account was reported to Central's security division.

8. Ken Morgan, the officer in charge of security at Central, reviewed the JDS records and noted large deposits and large withdrawals, especially one by wire transfer for $150,000 to be picked up in Las Vegas by Shepard on December 4, 1981.

9. Morgan and others under his supervision telephoned several of the persons whose names appeared on the charge slips and discovered that either they had ordered $5 worth of phonograph records pursuant to a newspaper advertisement or that they had ordered nothing from JDS but, at some time previously, had ordered something from Shepard Electronics, Inc., another business owned by and under the control of Shepard.

10. On December 17, 1981, Morgan was advised that the United States Postal Service was investigating Shepard and JDS based on a complaint filed by the New York Times. Morgan learned that Shepard had placed advertisements in the Times and other newspapers of national circulation offering to sell the "top ten record albums in the country" for $5.

11. The advertisements appeared in the newspapers the day before Shepard opened the JDS account, listing a toll-free telephone number through which record orders could be charged to VISA or MasterCharge. The telephone orders were received by an answering service in Omaha, Nebraska with which Shepard had contracted to receive and forward the orders. Upon receipt of the orders, the answering service forwarded them by courier to Shepard in Rochester, New York where he altered the $5 orders (charge slips) to read either $50 or $250.

12. On or about December 1, 1981, Shepard moved the offices of his various businesses to his home in Fairport, New York, and he instructed the Post Office to forward all mail for himself and for his various businesses to the home address.

13. From June, 1981, through December 18, 1981, Shepard employed Mary E. ("Liz") McCormick as a secretary. McCormick is the person who actually made the deposits into the JDS account at Central and in many instances cashed the checks to make the withdrawals.

14. McCormick last saw Shepard on December 7, 1981. After that date, however, and in accordance with Shepard's instructions, McCormick cashed three more checks, each in the amount of $10,000.

15. McCormick put the $30,000 in currency into a filing cabinet in Shepard's home. McCormick last saw the money in the cabinet on December 18, 1981. To her knowledge, no one other than she had access to the house.

16. On December 22, 1981, United States Postal Inspector Frank Kormann obtained a search warrant authorizing a search of Shepard's home.

17. The premises were searched the same day and among the items recovered was currency in the total amount of $28,440. The currency was still wrapped or

"strapped" in the paper wrappers utilized by Central in the normal course of its business.

18. The wrappers had been dated and stamped by Central tellers, who worked at the branch at which Shepard had opened the JDS account, which was the same branch at which McCormick had cashed the last three checks totaling $30,000. The dates on the wrappers, which signify the date a Central teller counted and "strapped" the money, corresponded to the dates on which the checks were cashed.

19. On December 23, 1981, Inspector Kormann placed the currency into a safe deposit box at the Marine Midland Bank in Rochester.

20. The safe deposit box was not entered by any person until April 18, 1983, three days prior to this trial. On that date, Kormann and Morgan again counted the money and photographed it. The photographs were introduced into evidence.

21. Central has been damaged, to date, by the fraudulent conduct of Shepard in the amount of $239,954.91. Central's loss is computed by taking the total withdrawals ($249,551.50) and subtracting or giving credit for any recoveries made by Central ($9,596.59). The "credit" figure ($9,596.59) is comprised of a few cash deposits made into the JDS account ($762) and of an amount returned to Central by a payee of one of the checks written on the JDS account ($8,834.59).

22. Central's total loss may decrease by as much as $25,000 if all of the false charge slips are not charged back. However, Central's loss in any event exceeds $210,000.

## CONCLUSIONS OF LAW

■ 1. A bankruptcy court must look to state law to determine questions as to the rights of competing interests to property. *Georgia Pacific Corp. v. Sigma Service Corp.,* 22 B.R. 984 (M.D.La.1982).

■ 2. Where a question arises as to which state's law should apply, a federal court must use the choice of law rule of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

■ 3. To decide a particular issue in a tort action, Florida courts follow the guidelines set forth in the Restatement (Second) of Conflict of Laws, Section 146, which require a court to apply the law of the state having the most significant relationship to the occurrence and to the parties with respect to the issue. *Watts v. National Ins. Underwriters,* 540 F.Supp. 488 (S.D.Fla. 1982); *Bishop v. Florida Specialty Paint Co.,* 389 So.2d 999 (Fla.1980).

4. Inasmuch as Central is a New York corporation, all events in Shepard's scheme occurred in New York, Shepard was a resident of New York and the property in dispute is and has always been located in New York, the substantive law to be applied in the instant action is that of the State of New York.

■ 5. Under New York law, a constructive trust will be imposed if a person holding title to property is subject to an equitable duty to convey it to another person and he would be unjustly enriched if he were permitted to retain it. *United States v. Fontana,* 528 F.Supp. 137 (S.D.N.Y.1981); *In re Wyatt,* 6 B.R. 947 (E.D.N.Y.1980); *Frier v. J.W. Sales Corp.,* 261 App.Div. 388, 25 N.Y.S.2d 576 (App.Div.1947).

6. The circumstances in which a court will impose a constructive trust include those where the property was obtained by fraud. Based on the fact that Shepard obtained the currency in question as a result of a fraudulent scheme, absent an intervening bankruptcy, Shepard clearly would be charged with an equitable duty to reconvey any interest he may have in the currency to Central. *United States v. Fontana,* 528 F.Supp. 137 (S.D.N.Y.1981); *In re Wyatt,* 6 B.R. 947 (E.D.N.Y.1980); *Frier v. J.W. Sales Corp.,* 261 App.Div. 388, 25 N.Y.S.2d 576 (App.Div.1947).

■ 7. A constructive trust is analogous to an express trust in that a bifurcation of title occurs; bare legal title to the property is held by the possessor of the property

while the beneficial interest is held by the person entitled to the property. *United States v. Fontana,* 528 F.Supp. 137 (S.D.N.Y.1981); *In re Wyatt,* 6 B.R. 947 (E.D.N.Y. 1980).

8. A constructive trust arises at the time of the occurrence of the events giving rise to the duty to reconvey the property. *United States v. Fontana,* 528 F.Supp. 137 (S.D.N.Y.1981).

9. Under the former Bankruptcy Act, property held by a bankrupt in trust for another did not become a part of the bankruptcy estate. *In re Teltronics, Ltd.,* 649 F.2d 1236 (7th Cir.1981); *In re Wyatt,* 6 B.R. 947 (E.D.N.Y.1980). This was true in the case of constructive trusts arising through fraud, as well as in the case of express trusts. *In re Teltronics, Ltd.,* 649 F.2d 1236 (7th Cir.1981); *In re Kennedy & Cohen, Inc.,* 612 F.2d 963 (5th Cir.1980).

10. A person claiming to be the beneficiary under a constructive trust was required to trace the trust property and identify it in its original or substituted form. *In re Kennedy & Cohen, Inc., supra.* In the instant case, Central has clearly satisfied the tracing requirement.

11. Under the Bankruptcy Code, where a debtor holds only bare legal title to property without any equitable interest, bare legal title is all that becomes property of the estate. *In re Wyatt,* 6 B.R. 947 (D.C.E.D.N.Y.1980); 11 U.S.C. § 541. In other words, a trustee in bankruptcy succeeds to only such title and rights in property as the debtor had at the time the petition was filed. *Georgia Pacific Corp. v. Sigma Service Corp.,* 22 B.R. 984 (M.D.La. 1982).

12. Hence, the result reached under the Code is the same as that reached under the Act. *In re Angus,* 9 B.R. 769 (Bkrtcy.D.Or. 1981); 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1983).

13. Although the bankruptcy trustee acquires bare legal title to property imposed with a constructive trust in favor of another, this interest is of no value to the estate and the trustee will be required to reconvey the property to the beneficial owner, subject only to proof under the doctrine of tracing. Shepard acquired the currency pursuant to a fraudulent scheme and therefore held the currency in constructive trust for Central. As a result, the Trustee acquired only bare legal title to the currency while Central retained the beneficial interest. This Court will require the Trustee to reconvey the currency to Central. *In re Cubbler,* 17 B.R. 674 (Bkrtcy.E.D.Pa.1982); *In re Angus,* 9 B.R. 769 (Bkrtcy.D.Or.1981); 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1983).

A final judgment will be entered in favor of Central and against the Trustee in accordance with these Findings of Fact and Conclusions of Law.