Manuel FLORES and Wilshire Insurance Company, Appellants-Cross-Appellees,

v.

UNITED STATES of America, Appellee-Cross-Appellant.

Nos. 75–1627, 75–1698.

United States Court of Appeals, Ninth Circuit.

April 11, 1977.

Terry Knoepp, U. S. Atty., San Diego, Cal., Myron C. Baum, Gilbert E. Andrews, Chief, Grant W. Wiprud, Atty., argued, Appellate Section, U. S. Dept. of Justice, Washington, D. C., for appellee-cross-appellant.

J. David Hennigan, argued, Riverside, Cal., for appellants-cross-appellees.

Before ELY and KENNEDY, Circuit Judges, and FERGUSON,* District Judge.

ELY, Circuit Judge:

Under 26 U.S.C. § 7426, Flores instituted a suit to recover $110,000 seized from him by Internal Revenue Service Agents in Calexico, California, on November 6, 1973. The District Court ordered the return of only $10,000 to Flores, and both parties appeal.

* Honorable Warren J. Ferguson, District Judge for the Central District of California, sitting by designation.

## FACTS

Flores is a bail bondsman who serves as an independent agent for Wilshire Insurance Co., his surety and underwriter which also joined, *pro forma,* as a party plaintiff. On November 6, 1973, he was contacted in the federal courthouse in Los Angeles, California, by a person identifying herself as a friend of one Guillermo Beltran. The person requested Flores to post bail on behalf of Beltran, a citizen of Mexico, who had been arrested and charged with possession of marijuana, with bail fixed at $100,000. Flores informed the woman that in the circumstances of the case, the surety would require cash security in the full amount of the bond, plus the standard premium of 10%. Flores was informed that the money for the security and, also the premium, would be delivered to him in Mexicali, Mexico. Flores thereupon chartered an airplane and flew to Calexico, California, directly across the border from Mexicali. He was accompanied by a woman who had contacted him and a friend of his, Elizabeth Gonzales. That afternoon in Mexicali, Flores met Josephina Sanchez and a woman identified as Prieta. These two women told Flores that they were unable to produce the money at that time but would have it available on the following day.

On the following day, at approximately 10:00 a. m., Flores met the two women in a Mexican restaurant approximately one block from the American-Mexican border station. After a short conversation, the women handed Flores a paper bag containing $110,000 in American currency. The currency was contained in bank wrappers from Banco de Commercial. Josephina Sanchez told Flores that the money belonged to her, and Flores gave her a receipt. After making arrangements to fly to Los Angeles to post the bail, Flores and Mrs. Gonzales then proceeded to the border station in a pickup truck loaned to them by Mrs. Sanchez. The evidence is conflicting as to whether Flores voluntarily informed customs officials of the amount of money he was transporting. In any event, the officials discovered the money, and Flores was detained with the money at the border station. After a delay of 5½ hours, Gloria Nelson, a representative of the Internal Revenue Service arrived, asked Flores a few questions, and seized the money. The seizure was made pursuant to notice of levy served upon Flores and describing alleged tax liabilities of Guillermo Beltran to the United States in the amount of $157,029.

While Flores was being detained, two attorneys having some connection with Beltran called the border station to inquire as to the whereabouts of Flores and the money. One of the attorneys was from San Diego, California, and the other was one Buenrostro, a Mexican attorney. On November 12, 1973, Buenrostro delivered to an official at the United States Border Station at Calexico two letters on the stationery of Banco Mexicano de Occidente. One of the letters identified Buenrostro as an attorney representing the bank. The second letter stated that the sum of $110,000 which had been seized by the Internal Revenue Service from Flores represented an agricultural loan from the bank to Guillermo Beltran, and that the bank was cancelling that extended credit.

Flores instituted his suit immediately after the seizure of the money. An attempt was made by both parties to include Josephina Sanchez as a party to the suit, or to take her deposition, but she disappeared after forcing Flores, under threat of harm, personally to repay the full amount of the money to her.

I.

Section 7426 contains two distinct prerequisites to its application: (1) that the plaintiff have an interest in or lien on the property at issue, and (2) that the levy be wrongful (*i. e.,* that the property not be the taxpayer's). The first of these requirements ensures standing; the second focuses on the condition precedent to government seizure, a nexus between the taxpayer and the property. The trial court rightly found that since Flores was a bailee in possession at the time of the seizure, the first of these requirements was satisfied.

■ The controversy has centered on the second of these elements: the wrongfulness of the levy. The issue to be determined by the District Court was therefore uncomplicated: did the money belong to Beltran? The evidence, however, was sparse. The only clearly stated claim to ownership was that of Josephina Sanchez, who, according to Flores, said that he should make out a receipt for the cash "to me, of course; it's my money." Her post-seizure demands that Flores return the money to her or face bodily harm may perhaps be regarded as a further assertion of her interest. On the other hand, the Government attempted to present circumstantial evidence suggesting that various agents of Beltran may have been at work to procure money that was inaccessible to him while he was in prison. After a careful review of the record, however, we have concluded that the evidence linking the money to Beltran will not support a finding, and the trial judge's finding in this respect is, therefore, clearly erroneous.[1] Our reasons are summarized as follows:

(1) The Government emphasizes that the evidence disclosed that Flores had met with Beltran about posting bail prior to his (Flores') meeting with the unidentified woman outside the courthouse. But we are unable to see how evidence of Beltran's desire to be released on bail supports a finding that the bail money was his and his alone. The record nowhere suggests or insinuates any previous connection between Beltran and the woman who initially contacted Flores on November 6th.

(2) The Government relies heavily on the testimony of Internal Revenue agent Nelson, who stated that Flores admitted to her that the money belonged to Beltran. In making its argument, however, the Government completely ignores Flores' statement that he told Nelson only that the money was to be used for Beltran's bail, not that the money belonged to Beltran. The trial judge weighed the credibility of the witnesses, and specifically found that the money was to be used for Beltran's bail, as Flores testified. Since the judge impliedly rejected Nelson's literal version of the alleged statement, Nelson's testimony does not support the court's more general finding as to the *ownership* of the money.

(3) Finally, the Government asserts that the inquiries made by the Mexican attorney, Buenrostro, also support the critical finding. But in our view, the fact that someone connected to Beltran expressed interest in the whereabouts of Flores and the bail money is not probative on the question of whether Beltran owned the money. Beltran obviously had good reason to be interested in money that was going to be used to post his bail, regardless of whether he owned that money or not. The trial judge found that the letters were employed as a strategem to enable Buenrostro to gain possession of the $110,000, and that this ploy represented a claim of ownership on behalf of Beltran. We are unable to avoid the conclusion that, in the light of the record, this finding was clearly erroneous.

■ The letters were hearsay and therefore inadmissible as positive evidence. The judge appropriately recognized the hearsay quality of the documents; consequently he could not accept the letters as proof that the bank had loaned the money to Beltran. Disregarding any hearsay implication of ownership contained in the letters, there was nothing in Buenrostro's conduct which connected the money to Beltran in any way whatsoever. Both the District Court and the Government appear to have overlooked

---

1. Although the District Court labeled its determination a conclusion, the Government argues, and we agree, that the determination is a factual finding to which the "clearly erroneous" test is applicable. Any conclusion in this respect is understandable in view of the fact that ownership of the money is the ultimate issue in the case and is virtually synonymous with the legal conclusion as to the "wrongfulness," *vel non*, of the levy.

The district judge's determination of what is a factual issue would ordinarily be respected, especially when based on such a sparse and far from definitive record. But where, as here, his decision was guided primarily by the view that the burden of proof lay upon the plaintiff, it is necessary for us to separate the *factual* bases for his decision from the *legal* questions discussed in part II of our opinion.

the critical fact that Buenrostro purported to act as counsel for the Banco Mexicano de Occidente, not for Beltran. Thus, to prove the tenuous link between Buenrostro, Beltran, and the money, the Government must necessarily have relied on that hearsay statement in the letter which described the money as an agricultural loan to Beltran. This is an impermissible method of proof under Rule 802, Fed.R.Evid., and constitutes no evidence, substantial or insubstantial, to support the finding that Beltran was the owner of the money.

The Government's rather tortuous claim that Buenrostro's assertion of ownership is admissible as circumstantial evidence of Beltran's ownership is without any merit whatsoever.[2]

> What the Hearsay rule forbids . . is the use of testimonial evidence—i. e., assertion—uttered not under cross-examination. If, then, an utterance can be used as circumstantial evidence, i. e., *without inferring from it as an assertion to the fact asserted* . . . , the Hearsay rule does not oppose any barrier . . . . (emphasis added).

6 J. Wigmore, Evidence § 1788 at 234 (3d ed. 1940). As we have already emphasized, the Government sought to rely on the facts asserted in the letters and to use the assertion for testimonial value. Rule 802 bars their admission for this purpose. *Cf. Sica v. United States,* 325 F.2d 831 (9th Cir. 1963).

## II.

Our inability to uphold the factual finding that Beltran was the money's owner leaves us with a perplexing question as to the interpretation of 26 U.S.C. § 7426 (1970). In essence, both parties rely on the absence of what they conceive to be critical evidence from their opponent and argue strenuously as to the nature and placement of the burden of proof in the proceeding. Because of the unique factual circumstances of the case and the absence of critical testimony, we agree that the resolution of the burden of proof issue is dispositive.

Section 7426 provides as follows:

(a)(1) Wrongful levy.—If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary or his delegate.

\* \* \* \* \* \*

(b)(2) Recovery of Property.—If the court determines that such property has been wrongfully levied upon, the court may—

. . . (B) grant a judgment for the amount of money levied upon . . .[3]

Care must be taken to recognize that the statutory scheme which governs tax litigation between individuals and the United States Government is not monolithic; particular sections of the Internal Revenue Code, as they apply to persons who are differently situated, serve different pur-

---

**2.** The fallacy in the Government's argument can be better understood when the factual context is simplified. If Buenrostro had approached the customs station and stated, "This money belongs to Beltran," the statement would clearly be inadmissible hearsay testimony. The statement could not be received as circumstantial evidence that the money belonged to Beltran. It would constitute *direct* evidence of Beltran's ownership, but the hearsay rule would, without doubt, bar its admission.

**3.** The legislative history of the provisions reveals that " 'Wrongful' . . ., refers to a proceeding against property which is not the taxpayer's." S.Rep.No.1708, 89th Cong., 2d Sess., at 30 (1966–2 Cum.Bull. 815, 897), U.S. Code Cong. & Admin.News 1966, pp. 3722, 3751; H.Rep.No.1884, 89th Cong., 2d Sess., at 28 (1966–2 Cum.Bull. 815, 835). Regulations issued by the Commissioner specify that a levy is wrongful if "the levy is upon property in which the taxpayer had no interest at the time the lien arose or thereafter." 26 C.F.R. § 301.-7426–1 at 255 (1974). While this limited legislative and administrative guidance is significant, it affords little aid in determining the appropriate placement of the burden of proof.

poses, were drafted with different intents, and therefore require individualized construction. A plaintiff, such as Mr. Flores, who comes within the terms of § 7426 is unlike a taxpayer who in response to an assessment and payment of taxes *on his own account* must carry the burden of disproving his liability in the amount calculated by the Government. *See* 26 U.S.C. § 7422; *United States v. Anderson,* 269 U.S. 422, 433, 46 S.Ct. 131, 70 L.Ed. 347 (1926). Nor is he like a transferee who is *himself assessed* for taxes originally due from a taxpayer other than himself. *See Shannon v. United States,* 521 F.2d 56 (9th Cir. 1975). He also differs from one in possession of property subject to levy who is subjected to personal liability and from whom the Government may recover a penalty pursuant to 26 U.S.C. § 6332. It seems appropriate for such a person to carry the burden of showing non-ownership by the taxpayer as a defense because the purpose of the statute is a coercive one which seeks to foster swift tender of property which has been levied upon.

The plenary proceedings in a § 7426 action are quite different. The measure was enacted specifically because under then-current law, the United States could not be sued by third persons where its collection activities interfered with their property rights. 1966 U.S.Code Cong. & Admin. News, p. 3750. The fact that it contains one of the few exceptions to the anti-injunction act, 26 U.S.C. § 7421, shows that it was meant to have teeth and that litigants within its terms were regarded as significantly different from others with tax-related claims against the Government.

There is therefore reason to construe § 7426 on its own terms. Yet whatever may be said about its distinctive purpose,

we cannot completely ignore the fact that the statute's language indicates that it is the claimant, not the Government, who is asserting that the levy is wrongful. Relying on these rather plain terms, several district courts have therefore indicated that a § 7426 plaintiff bears the burden of proof. *See, e. g., Smith v. United States,* 76–2 United States Tax Cases ¶ 9621 (N.D.Cal. C–73–1581–AJZ, Aug. 20, 1976); *Messina v. Commissioner,* 76–2 United States Tax Cases ¶ 9536 (W.D.Mo. C.A.No. 73–CV337–W–3, June 21, 1976). Along these lines, this court has observed in another case involving analysis of the burden of proof under the tax laws that "In most litigation, from time immemorial, the burden of proof—i. e., the burden of persuasion—is on the plaintiff." *Rockwell v. Commissioner,* 512 F.2d 882, 887 (9th Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975).

Such considerations pale, however, when we look to the heart of the situation before us. The Government has seized property held by the plaintiff; plaintiff, with the consent of Congress, now seeks its return. But the Government, too, is seeking something: it is asking the court to uphold its seizure, now matured into a taking. To so take property from the hands of an interested third party is more than simply to require an individual to pay taxes levied in due course against himself. The constitutional dimensions of this situation, under both the Fourth and Fifth Amendments, cannot be ignored.[4]

We start by observing that just as police need probable cause to believe that evidence sought is to be found in the area to be searched and that such evidence relates to a crime, so, too, the Internal Revenue Service needs probable cause at the time assets are initially seized to connect

---

4. The Supreme Court has recently had occasion to apply these constitutional principles in a tax context. In *G. M. Leasing Corp. v. United States,* —— U.S. ——, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977), the Court held that seizure for tax purposes of books and records from a private office without benefit of a search warrant violated the Fourth Amendment. Seizure of automobiles in satisfaction of outstanding assess-

ments was upheld, however, on the ground that it took place in the open. In reaching that decision, the Court observed that cases that considered due process in tax proceedings have in the past relied on Fourth Amendment analysis and indicated that due process analysis could appropriately be applied in a tax search case. 20 Cr.L.R. at 3039, n.18.

those assets to a taxpayer with outstanding taxes due.[5] At the time of proceedings under § 7426 which will either sustain or void that seizure, it is equally necessary that the Revenue Service show that a nexus exists between the taxpayer and the property, or the permanent deprivation that has resulted from the seizure would be arbitrary and as a result offensive to the requirements of due process of law.[6] Since the Internal Revenue Service has this obligation in any event, it seems highly appropriate for the Government to bear the burden of persuasion on what is really the identical question raised by the terms of the statute—whether the levy is wrongful because the taxpayer has no interest in the property.

By holding that the Internal Revenue Service has the burden of persuasion on this issue, we are determining that in the absence of proof, the plaintiff will prevail. *See* 9 *Wigmore on Evidence* § 2485 (3d ed. 1940). Were this not the case, the taxes of a California resident could be collected from a totally unrelated person in New York, and the New Yorker would be forced to prove a negative fact about which he has absolutely no information, *i. e.,* that the Californian has no interest in his property.[7] Principles

---

**5.** The Supreme Court assumed in *G. M. Leasing Corp. v. United States, supra,* that the relationship between the taxpayer and the property subject to levy plays a role in determining whether probable cause to support a tax search and seizure exists. *See* 20 Cr.L.R. at 3039.

The Court, while not yet addressing the question specifically, has also recently noted that three key cases (*North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 607, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 610–611, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); and *Fuentes v. Shevin,* 407 U.S. 67, 72, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972)) could raise the question of whether "due process demands that the taxpayer in a jeopardy assessment situation be afforded a prompt post-assessment hearing at which the *Government* must make some preliminary showing in support of the assessment." (Emphasis added.) *Laing v. United States,* 423 U.S. 161, 183–184 n.26, 96 S.Ct. 473, 485, 46 L.Ed.2d 416 (1976).

While a related and quite probably stronger argument might well be presented by a third party holder of property seized to satisfy the jeopardy assessment of another, we are not here presented with such a demand for a prompt *post-seizure* hearing. We feel safe in saying, however, that whether or not such a hearing is required, probable cause to believe that the taxpayer had an interest in the property would still be necessary before seizure could be justified.

**6.** Inquiry concerning the propriety of tax seizures of the sort at issue here may arise at either of two times—when the seizure is initially effected, or when the seizure is sustained so that the taking becomes permanent. In the first instance, a seizure may be reasonable for Fourth Amendment purposes if there is probable cause to believe that the property seized belongs to the taxpayer. Hearsay and other evidence that would be inadmissible in a normal proceeding may suffice to make that belief

reasonable, just as such evidence may appropriately be introduced to sustain a search. But seizure, unlike search, can ripen into a permanent taking. At this later stage, the sufficiency of support for the Government's belief in the reasonableness of its actions is no longer the issue; instead the question is whether the taking is in fact so unreasonable as to be arbitrary. There is therefore no more reason to consider hearsay or other such evidence than when any other question of fact is to be determined.

**7.** As Justice Stewart said in *Elkins v. United States,* 364 U.S. 206, 218, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960), "as a practical matter it is never easy to prove a negative".

The Supreme Court's recent decision in *Commissioner v. Shapiro,* 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976) suggests that burdening the Government on a related ground— its superior access to information necessary to the plaintiff's case—is not inappropriate in tax litigation. There, petitioner sought to come within the judicially-created *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962) exception to the anti-injunction act. To do so, he needed to show (1) that it was clear that the Government could under no circumstances ultimately prevail and (2) that he would suffer irreparable harm if an injunction were not to issue. Since the first of these tests must be determined based on the information available to the Government at the time of the suit, the Court required the Government to disclose the relevant facts. Whether this information should be provided by requiring responses to interrogatories or by placing the burden of producing evidence on the Government was left to the trial court, however.

The instant case is both similar to and different from *Shapiro.* Here, too, the Government has facts which are needed, yet beyond the reach of the plaintiff. Here, however, they are doubly beyond reach, for they involve the

of fair play and common sense dictate the result which we reach.[8]

 Since the record is clear that the Government failed to introduce sufficient evidence supporting its claim that the money held by Flores belonged to Beltran even to bring the question within the realm of the trier of fact, we have no choice but to conclude that the levy was wrongful. Accordingly, the Government's cross-appeal is without merit, but the appeal of Flores is well taken; therefore, upon remand, the District Court will order that the full amount of the seized funds be returned to Flores.

AFFIRMED in part; REVERSED and REMANDED in part; with directions.

Government's ground for believing that a connection exists between a *third party* taxpayer and property in the possession of the plaintiff, not merely its grounds for believing on the basis of the plaintiff-taxpayer's *own* actions that taxes are due. *Shapiro* recognized that even where a plaintiff is faced with the most onerous of possible burdens, coming within an equitable exception to a flat statutory prohibition by showing that the Government cannot possibly succeed on the merits, a court may be obliged to burden the Government, along with the plaintiff, to provide at least some justification for its conduct, rather than sitting with folded hands while asserting its summary power.

8. We are not here faced with a situation in which the Government demonstrates a nexus between the taxpayer and the property by a preponderance of the evidence, but the plaintiff makes a claim to the property derivatively from the taxpayer, through gift or otherwise. Obviously, that situation is different from the present case, and our holding is limited to a requirement that the Government trace the property *to* the taxpayer. *See Rabinof v. United States,* 329 F.Supp. 830 (S.D.N.Y.1971); *Lapp v. United States,* 316 F.Supp. 386 (S.D. Fla.1970).