UNITED STATES of America, Plaintiff,

v.

**CAPITAL SAVINGS ASSOCIATION, Successor to First State Savings Association, Defendant.**

**Civ. No. H 80–692.**

United States District Court,
N.D. Indiana,
Hammond Division.

July 27, 1983.

Charles B. Miller, Asst. U.S. Atty., Hammond, Ind., T. Kazan Ray, Tax Div., Dept. of Justice, Washington, D.C., for United States.

James A. Holcomb, Lucas, Clifford & Holcomb, Merrillville, Ind., for defendant.

David Capp, Cohen & Thiros, Merrillville, Ind., for third party defendant.

## MEMORANDUM, OPINION and ORDER

MOODY, District Judge.

This cause came on for trial without intervention of a jury upon Plaintiff's Complaint and the Defendant's Answer and affirmative defenses only on the 23rd day of May, 1983, and the Court, having heard and considered the evidence, finds the facts and states the conclusions of law as follows:

### FINDINGS OF FACT

1. The Defendant, Capital Savings Association, formerly known as First State Savings Association, is a savings and loan association having its principal offices at 100 West Ridge Road, Gary, Indiana.

2. That on November 16, 1978 Pete Bianco a/k/a Peter J. Bianco owed delinquent income taxes to the United States

government for the years 1968 through 1971. That this tax liability was his alone and that his wife, Mary T. Bianco, had been granted "innocent spouse" status.

3. On November 16, 1978 David M. Moss, a Revenue Agent with the Internal Revenue Service, served a "Notice of Levy" upon the defendant at its offices at 100 West Ridge Road, Gary, Indiana, requiring the defendant to pay over to the Internal Revenue Service any property or rights to property belonging to the taxpayer, Peter J. Bianco. The Revenue Officer indicated that only those funds belonging to Peter J. Bianco were to be turned over pursuant to the Notice of Levy.

4. That on said date and at the time of the serving of the Notice of Levy there existed a savings account at First State Savings Association, now known as Capital Savings Association, Account No. B–495 in the joint names of Pete Bianco and Mary T. Bianco which account was opened on July 16, 1975 and which was rolled over from a previous account that the parties held in joint names, and which prior to that time belonged to Mary Bianco alone.

5. That on the same date, namely, November 16, 1978, one of the attorneys for the Defendant discussed with the Revenue Agent in charge of the collection the subject of Indiana law with respect to ownership of joint savings accounts, the procedures for determining same and inquired as to his or the authority of the IRS for levying upon a joint account when the liability is only that of one taxpayer rather than the joint tenants. The Revenue agent indicated that he would look into the question and get back to her in that regard.

6. That at no time from November 16, 1978 through April 25, 1979 did the Internal Revenue Service or any of its agents or employees ever furnish to the defendant or its attorneys, as requested, any authority for its levying on a joint savings account to satisfy the tax deficiency of one of the signators only to that joint account.

7. Further, on November 16, 1978, and after discussing the matter with defendant's counsel, the Revenue officer informed John Sikora, President of Capital Savings Association, that he did not expect payment that day but rather he should put a hold on the account until the Internal Revenue Service could determine exactly which portion or how much of the account should be paid over to the Internal Revenue Service in satisfaction of the levy.

8. On January 26, 1979, Mary Bianco, wishing to purchase a new home, entered Capital Savings Association for the purpose of obtaining a mortgage until such time as she could sell her home. John Sikora informed her that it was impossible to obtain a mortgage in the three to five day period which she indicated. Sikora then suggested to Mrs. Bianco that she withdraw the money from her savings account, No. B–495, and replace that money once her present home had been sold. It was at this time that Mr. Sikora informed Mrs. Bianco of the levy against the account and once again placed a call to the attorneys for Capital Savings Association indicating that Mrs. Bianco wanted to withdraw the funds from the savings account upon which the levy had been placed.

9. Upon being informed of the levy, Mrs. Bianco indicated to Mr. Sikora that the money in Account No. B–495 was her money, a claim which she maintains in this litigation and of which she had previously informed the Internal Revenue Service through her attorney.

10. That upon receiving the inquiry from the defendant concerning the request of Mary Bianco to withdraw the funds from the account in question, the attorneys for the defendant attempted to reach the Revenue agent and others at the Internal Revenue Service concerning this action, but were unsuccessful in their attempts. Unable to reach the Revenue Agent in charge and not having heard from him on January 29, 1979, and not having any word from the Internal Revenue Service or any of its agents or employees concerning the ownership question of the account or what specific funds, if any, were to be turned over to the Internal Revenue Service, Mary Bianco was allowed to withdraw the sum of $18,-

518.21 from Account No. B–495 on January 29, 1979.

11. Those funds were then used as payment for the home in which Mary Bianco and Peter Bianco presently reside and which was purchased shortly after the withdrawal of funds from the account in question on January 29, 1979.

12. On April 24, 1979, the Revenue agent contacted the attorneys for the defendant inquiring as to whether or not the funds in the account had been released and the following day, April 25, 1979, served a Final Demand upon the defendant.

13. From November 16, 1978 until April 25, 1979 the only action taken by the Internal Revenue Service to determine ownership interest in the account in question was to serve a summons upon First State Savings Association through which summons they obtained the signature card for the account and the card showing the transactions with respect to the account, namely, deposits, withdrawals and adding of dividends or interest.

14. That the signature card for the account in question contains the following language:

It is agreed by the signatory parties with each other and by the parties with you that any funds placed in or added to the account by any one of the parties *are and shall be conclusively intended to be a gift and delivery* at that time of such funds to the other signatory party or parties to the extent of his or their pro rata interest in the account. (Emphasis in original).

15. While the taxpayer, Peter Bianco, was in the service during the early '40s in World War II, Mary Bianco worked at U.S. Steel in Gary, Indiana and lived with her mother, saving all of her money. This money was deposited in the predecessor account to the one in question. After Peter Bianco returned from the service, Peter and Mary Bianco entered into the restaurant business at which they both worked seven days a week, a minimum of 12 hours a day.

16. After returning home from the service, Peter Bianco began losing money by way of betting or gambling and an agreement was reached between he and Mary Bianco that he would turn over all of his money to her. She cashed his paychecks, gave him an allowance, paid all the household bills, purchased the food and clothing and ran the entire household while he was employed.

17. From that time to the present, Mary Bianco handled all of the family finances; did all the banking; made all deposits in Account No. B–495; made all withdrawals in that account; did all the saving; and was the only one to deal with the savings account at First State Savings Association.

18. That Mary Bianco had complete control over the monies and the checks once turned over to her and further at all relevant times had control and possession of the pass book to savings Account No. B–495 and its predecessor accounts.

19. At the time that Peter Bianco turned over his checks and monies to Mary Bianco it was not his intention to make a gift of those sums to her at that time and prior to her depositing any of those sums in savings account No. B–495 or its predecessors. Rather, the agreement was a matter of convenience.

20. That at no time did Peter Bianco make any deposits or withdrawals to Account No. B–495 or any other account within the knowledge of First State Savings Association and Mr. Sikora never saw Peter Bianco transacting business in First State Savings Association.

21. That based upon Mary Bianco's handling of and dealing with the accounts and monies placed into and withdrawn from the accounts and further based upon statements made by Mary Bianco both immediately prior to withdrawal on January 26th and for the time she was a depositor, the defendant reasonably believed that the funds in Account No. B–495, belonged to Mary Bianco and not Peter Bianco.

22. That based upon the evidence, or reasonable inferences that can be drawn

therefrom and under the circumstances with which it was confronted, the Defendant, First State Savings Association, had reasonable cause to release the funds. in Account No. B–495 to Mary Bianco and to refuse to surrender such funds to the Government.

23. That Mary Bianco and Peter Bianco each owned one-half of the funds in the bank account at issue at the time of the levy.

24. That at the time of the levy, the bank account at issue contained a balance of $18,665.57.

## CONCLUSIONS OF LAW and DISCUSSION

The Government brought this case against Capital Savings Association, successor to First State Savings Association (Capital) to recover money withdrawn from a joint savings account held by Capital in the names of Peter and Mary Bianco. The Government served a notice of levy on Capital on November 16, 1978 in relation to any "property or rights to property" belonging to one Peter J. Bianco a/k/a Peter J. Pianco, Jr. On January 29, 1979, Capital permitted one Mary T. Bianco, wife of Peter Bianco to withdraw money from the joint account. The Government argues that this action violated the levy and that Capital is personally liable for the money withdrawn under 26 U.S.C. § 6332(c).

Section 6332(c)(1) provides in relevant part that:

Any person who fails or refuses to surrender any property, subject to ˙levy, upon demand by the Secretary, shall ˙be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of taxes for the collection of which such levy has been made.

Section 6332(c)(2) further provides for a penalty equal to fifty percent of the amount recoverable under paragraph (1) where the refusal is "without reasonable cause." In the present case the Government seeks to recover both the amount withdrawn from the Bianco account and a penalty.

■ A defendant in an action brought under section 6332(c) has only two alternative defenses: (a) the property at issue is subject to prior judicial execution or attachment, and (b) the defendant is not in possession of property owned by the taxpayer. See United States v. Weintraub, 613 F.2d 612 (6th Cir.1979); United States v. Sterling National Bank, 494 F.2d 919 (2d Cir. 1974). There is no indication of any kind that the bank account at issue here was subject to a prior ·judicial execution or attachment. Rather, Capital bases its case on the claim that the funds in the subject account belonged solely to Mary Bianco at the time of the levy and not to the delinquent taxpayer.

■ A determination of the relevant property interests in a tax levy case is a matter of state law. Aquilino v. United States, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). Some cases have held that the burden of proving a taxpayer's interest in property subject to levy rests on the Government. See, e.g., United States v. Stock Yards Bank of Louisville, 231 F.2d 628 (6th Cir.1956). More recent cases, however, have held that the burden rests on the party opposing the levy to show that the taxpayer does not have an interest in the property at issue. See, e.g., Flores v. United States, 551 F.2d 1169 (9th Cir.1977); United States v. National Bank of Commerce, 554 F.Supp. 110 (E.D.Ark.1982). The reasoning for the latter holdings is the belief that it is more appropriate to place the burden of showing nonownership by the taxpayer on the party challenging the levy "because the purpose of the ·statute is a coercive one which seeks to foster a swift tender of property which has been levied upon." Flores, 551 F.2d at 1174. In summary, although there are good arguments for placing the burden of proof on either party here, the Court concurs with the more recent case holdings above and concludes that the burden of proof is on the defendant in this case to show nonowner-

ship by the taxpayer in the joint account at issue.

Capital bases its defense in this case on the argument that the money in the account at issue belonged to Mary Bianco rather than Peter Bianco. The ownership of a joint bank account in Indiana is determined by the contributions of the parties to that account "unless there is clear and convincing evidence of a different intent." West's Ind.Code Ann. § 32–4–1.5–3(a). The evidence at trial reveals that most, if not all, of the money in the account at the time of the levy consisted of Peter Bianco's earnings. Although Mary Bianco testified that the account originally belonged to her and that some of the money deposited in the account prior to 1955 was contributed by her, she conceded that after 1955 all of the money deposited in the account at issue originated from Peter Bianco. Thus, if ownership of the account is based solely on contributions, the Court would find that most if not all of the funds in the account belonged to Peter Bianco. The decision on the ownership of the account does not end with analysis of the contributions, however, since Capital contends that it has "evidence. of a different intent." This "evidence of a different intent" consists of two somewhat related arguments.

Capital's first argument is based on the third party donee-beneficiary theory first recognized by the Indiana Supreme Court in *Estate of Fanning,* 263 Ind. 414, 333 N.E.2d 80 (1975). In that case, the donor purchased a certificate of deposit from a bank. The certificate was issued to the donor and the donee "either or to the survivor." The Court found that the certificate constituted a contract between the donor and the bank to which the donee was a third party donee-beneficiary. As such, the donee received a present gift of a contingent contractual right to the funds in the account. The contractual right was contingent because it could have been extinguished during the lifetime of the donor.

The *Fanning* case and the cases generally dealing with the third party donee-beneficiary theory involve disputes over dece-

dent's estates and whether the decedent actually intended the entire proceeds of the account to vest in the donee-beneficiary upon his death. *Estate of Fanning, supra; Moore v. Bowyer,* 180 Ind.App. 429, 388 N.E.2d 611, (1979); *Robison v. Fickle,* 167 Ind.App. 651, 340 N.E.2d 824 (1976). Consequently, it is somewhat difficult to apply the third party donee-beneficiary theory to a case like the present where both the donor and donee are living and the Court is required to carve out their respective interests in a joint account. Even though these cases may not directly apply in the present situation they are analogous and they teach that a determination by this Court as to the effect of any contract herein on the interest of Peter and Mary Bianco in the joint account at issue must be based, as in the cases above, on the clear language of the contract itself. *See, e.g., Robison, supra.*

Capital would apply the theory discussed in the *Fanning* case to the present situation by arguing that Mary Bianco was a third party donee-beneficiary of the contract between Capital and Peter Bianco. The contract here is the signature card signed by both Mary and Peter Bianco and which provides that all deposits in the account by either of the parties "are and shall be conclusively intended to be a gift and delivery at that time of such funds to the other signatory party . . . to the extent of his . . . pro rata interest in the account." As applied in the present case, then, the theory urged by Capital would only provide Mary Bianco with a one-half interest in the joint account. The reason for this is that the plain language of the contract states that the noncontributing party in a joint account receives a gift of funds deposited to that account only "to the extent of his . . . pro rata interest in the account." As there are two parties to the account at issue, Mary Bianco's pro rata interest in the account is one-half and, as per the terms of the contract between Peter Bianco and Capital, she is the owner of no more than one-half of the account.

■ Capital disagrees that Mary Bianco only owned one-half of the account. Rather, Capital contends that an agreement existed between Mary and Peter Bianco in which Peter completed a gift *inter vivos* to Mary of all his money, prior to it being deposited in the joint account. This is, in effect, an attempt by Capital to vary the terms of a third party donee-beneficiary contract by the use of parol evidence. This is generally impermissible where, as here, the meaning of the contract is plain and unambiguous. *Robison v. Fickle,* 340 N.E.2d at 828–9. Even so, assuming *arguendo* that such evidence could be admitted to vary the terms of the contract, the Court does not find that they would do so.

Capital bases its argument that Mary Bianco was a gift recipient of all Peter's money on the following facts: Mary Bianco opened the account at issue prior to her marriage to Peter Bianco; shortly after their marriage Mary added Peter's name to the account because, in her words, "in case something should happen to her"; Peter Bianco served in the military during World War II and returned home with a gambling problem; Peter and Mary reached an agreement that from thence forth Mary would have complete control over the family finances; that from the time of their agreement to the present Peter Bianco turned over his paychecks to Mary, who would cash them, give Peter an allowance, pay the bills and bank the remainder; and finally, that Mary handled all of the deposits and the withdrawals in the account at issue. Capital argues that these facts show that Peter made an *inter vivos* gift to Mary of all his earnings. The Court does not agree.

■ A valid gift *inter vivos* must be the result of a donative intent borne by the free will of the donor. *Kraus v. Kraus,* 235 Ind. 325, 132 N.E.2d 608 (1956); *Bulen v. Pendleton Banking Co.,* 118 Ind.App. 217, 78 N.E.2d 449 (1948). Mary Bianco testified on direct that she insisted that Peter Bianco allow her to manage his money or else she would leave him. Certainly this belies a free will or a donative intent on the part of Peter Bianco to give up all his rights to the money. Furthermore, the Court finds that the agreement between Peter and Mary Bianco was more in the nature of a convenience than a gift. As with an incompetent person who permits another to sign checks on his account for the purpose of paying his expenses and so forth, Peter Bianco permitted his wife to handle the family financial affairs because he was unable to do so in a manner that would keep his family intact. Such an arrangement does not constitute a gift. *Cf. Gary National Bank v. Sabo,* 151 Ind.App. 258, 279 N.E.2d 248, 252 (1972). Based on the Court's interpretation of the agreement between Peter and Mary Bianco, then, the Court does not find that the agreement varied the clear and unambiguous contractual terms of the signature card in any way. Based on those terms, the Court concludes that Mary and Peter Bianco each owned one-half of the funds in the joint account.

■ As the Court has concluded that Mary and Peter Bianco each owned one-half interest in the joint account at Capital, it follows that the Government's levy was effective against one-half of the account. A joint account may be subject to claims to the extent of the debtor-party's interest therein. *Cf.* West's Ind.Code Ann. § 32–4–1.5–7 (a surviving party to a joint account is liable to the decedent's personal representative for the amount of the account which the decedent owned beneficially in order to discharge unpaid claims against the decedent's estate); § 32–4–1.5–13 (where a party to a joint account is indebted to a financial institution, the financial institution has a right to a set-off on that portion of the account to which the debtor was beneficially entitled). At the time of the levy on November 16, 1978, the account contained a balance of $18,665.57, one-half of which belonged to Peter Bianco and was subject to the levy. Section 6332(c)(1) provides that the bank is liable for "a sum equal to the value of the property [subject to levy] not so surrendered." Accordingly,

the bank is liable for one-half of $18,665.57, which equals $9,332.79.

■ Capital presents three remaining arguments in its favor which the Court now rejects. Capital argues that the levy here is unenforceable because the Government failed to show that it met three prerequisites to levy: assessment; notice to taxpayer of deficiency and demand for payment; and failure of the taxpayer to pay the deficiency within ten days. *See Martinez v. United States,* 669 F.2d 568 (9th Cir.1981). Capital maintains that the Government failed to present evidence at trial of its compliance with these prerequisites. This is incorrect. The Government submitted its Exhibit A into evidence which shows the assessments made, the notices sent to Peter Bianco and the subsequent partial payments. By implication, then, this exhibit also shows the failure of Peter Bianco to pay his tax arrearages within ten days. The exhibit was admitted into evidence without objection by Capital. Capital's counsel points out that he stipulated to the admission of the exhibit stating that he assumed the exhibit was apparently being admitted merely to show the assessments and payments. Capital now argues that it did not agree for the document to be admitted to show the Government's compliance with the levy prerequisites. Where a party seeks to limit the purpose for which evidence is admitted at trial, it is incumbent upon the party to make an explicit request for such a limitation. Fed.R.Evid., Rule 105; 1 Louisell and Mueller, *Federal Evidence* § 45 (1977). This request was not made and cannot be implied based on counsel's comment at the time of admission of what the opposing party's evidence was apparently being admitted for. Furthermore, this Court will not nullify a legitimate Internal Revenue Service levy for unpaid taxes where it clearly appears on the face of the record that the statutory prerequisites for that levy were satisfied.

■ Capital next argues that it should not be held personally liable because the levy placed Capital in a position of potential double liability. Presumably Capital feels that if it had given the money in the joint account to the Government pursuant to the levy, it would have been subject to a claim by Mary Bianco that the money had belonged to her. Capital further points out that section 6332(d) protects it only from liability to the delinquent taxpayer. The short answer to Capital's argument is that it has failed to point out any authority showing that the possibility of multiple liability serves as a defense in an action for personal liability under section 6332(c). Callous as this response may seem, it is not the Court that enacted the Internal Revenue Code. The Court recognizes that Mary Bianco was a longtime valued customer of Capital Savings and certainly Capital wanted to please her when she wished to withdraw the money. Even so, there was a levy on the account. Had Capital released the money in the account to the Government in accordance with the levy, the proper procedure would have been for Mary Bianco to bring a refund action under 26 U.S.C. § 7426. *Cf. United States v. Rodgers,* —— U.S. ——, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983). In such an action, the burden would have been on the Government to prove that the property belonged to the taxpayer. *Flores, supra.* Of course, this may not bar Mary Bianco from also bringing an action against Capital for releasing the money to the Government. Without deciding what Capital's interest in the money was, it might be possible in such case for Capital to bring the Government in as a third-party defendant under section 7426.

■ Capital's final argument is that the Government should be estopped from asserting the personal liability of Capital here because of its inaction in informing Capital as to how the ownership of the account should be determined. The simple answer to this contention is that the facts of this case do not present a situation where estoppel would apply. Generally, "one who by his deed or conduct has induced another to act in a particular manner will not be permitted to adopt an inconsistent position ... and thereby cause loss or

injury to another." 31 *C.J.S.* Estoppel § 1 (1964). Mere silence will operate as an estoppel only where there is a duty to speak and where the silence has led the adverse party to do something which he would not have done but for such silence. *Id.* at § 87. Capital cannot argue that it permitted Mary Bianco to withdraw the money because the Government failed to inform Capital of its position on the ownership of the account. Granted, the Government did promise to make such a determination, but its failure to do so cannot be construed as prior approval of Capital's action. Capital's estoppel argument is without merit.

One more issue is as yet to be determined here regarding whether Capital is subject to the fifty percent penalty provision of section 6332(c)(2). Section 6332(c)(2) provides for a penalty where a defendant's refusal to surrender property subject to levy is without reasonable cause. A "reasonable cause" to resist the levy exists where there is a bona fide dispute over the amount of property owned by the taxpayer. *United States v. Sterling National Bank and Trust,* 494 F.2d 919, 923 (2nd Cir.1974). The Court finds that there was a bona fide dispute as to the ownership of the property in question in this case and that no penalty should be imposed.

### JUDGMENT

It is therefore ORDERED that:

(1) the plaintiff has prevailed in this action and the defendant therefore is liable to the plaintiff in the amount of $9,332.79, plus any interest which may be applicable by law;

(2) the defendant had reasonable cause to refuse to surrender the funds at issue and therefore will not be subject to the penalty provisions of 26 U.S.C. § 6332(c)(2); and

(3) each party shall bear its own costs.