TMG II, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 85–2469–LFO.

United States District Court, District of Columbia.

Sept. 30, 1991.

Allen I. Mendelsohn, for plaintiffs.

Michael Kearns and Edward Snyder, for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

From 1979 to 1983, through a series of limited partnerships that included plaintiffs' TMG Associates and TMG II (the "Partnerships"), Edward Markowitz "created and marketed more than $445 million in false and fraudulent federal income tax deductions through sham, non-existent and pre-arranged transactions in United States Government securities and precious metals forward contracts."[1] Eventually, the Government uncovered the scheme and prosecuted Markowitz as well as several of his associates for filing and conspiring to file fraudulent tax returns.[2]

This case arises out of a civil action brought against Markowitz. In 1983 and 1984, the Partnerships sued Markowitz for failing to account for partnership property before resigning as general partner. These claims were eventually settled, and in August, 1985, a judgment for nearly $900,000 was entered against Markowitz.[3] However, in January of that year, well before the Partnerships obtained their judgment, the Internal Revenue Service (IRS) filed over $5 million dollars in tax liens against Markowitz.[4] To establish the priority of their claims over the Government's, the Partnerships instituted this action.

Currently before the Court, are cross-motions for summary judgment. For the reasons stated below, the accompanying order will grant the defendant's motion for summary judgment, deny the plaintiffs' motion for summary judgment, and dismiss plaintiffs' claims.

### I.

The Partnerships were organized in 1979 and 1980 as limited partnerships under New York law with Markowitz either as the managing general partner or as the controlling stockholder of the corporation acting as the general partner.[5] Officially, the Partnerships were to operate "as broker-dealer and market maker in commodities and metals, and futures and option contracts therein," and perhaps as well to "trade in exempt securities and currencies."[6] In private, however, promoters

---

1. Information, *United States v. Markowitz*, 85 Cr. 393, ¶ 1 (S.D.N.Y. April 25, 1985) (Complaint, Attachment 1) [hereinafter, "Information"].

2. *See, e.g., United States v. Oshatz*, 912 F.2d 534 (2d Cir.1990) (affirming the conviction of two lawyers associated with Markowitz); *North River Ins. Co. Inc. v. Stefanou*, 831 F.2d 484, 485 (4th Cir.1987) (noting the plea of an accountant associated with Markowitz); *United States v. Markowitz*, No. 85 Cr. 393, slip op. at *1, 1986 WL 3789 (S.D.N.Y. March 27, 1986) (WESTLAW, Federal library, Unreported District Court Cases file) (noting that on April 25, 1985, Markowitz pleaded guilty to conspiracy to defraud, aiding and assisting false returns, and tax evasion).

3. *See* Order of August 30, 1985, *Weil v. Markowitz*, Nos. 83–3685 & 84–1680, at 4 [hereinafter, "Order of August 30, 1985"].

4. *See* Notice of Federal Tax Lien Under Internal Revenue Laws, January 14, 1985 (Complaint, Attachment 2).

5. *See Weil v. Markowitz*, 829 F.2d 166, 168 n. 1 (D.C.Cir.1987) (noting that while Donald Weil had a 35% general partnership interest in TMG II he had no day-to-day responsibilities) Markowitz Declaration ¶ 1.

6. TMG II, Private Placement Memorandum, November 3, 1980, at ii (Second Strzegowski Declaration, Exhibit C); *see* TMG Associates, Private Placement Memorandum, November 1, 1979,

promised that the Partnerships were excellent tax shelters and would produce four dollars in tax losses for every dollar invested.[7] Attracted by these promises, approximately 130 individuals and firms invested approximately $4.8 million in TMG Associates and TMG II,[8] and between 1980 and 1982 most of them did, in fact, take 4:1 write-offs on their investments.[9]

There were even then, signs, in addition to the promise of 4:1 write-offs, that Markowitz's activities might be questionable. In 1981, Markowitz, who had few assets before the formation of the limited Partnerships,[10] embarked on a massive buying spree. First, he purchased a home at 2323 Porter Street overlooking Rock Creek Park for $385,000.[11] Next, he bought a Rolls Royce.[12] Then, in short order, Markowitz purchased a house at 2329 Porter Street, for his sister, at a cost of nearly a half million dollars, established "Markowitz Stables" which eventually accumulated more than a million dollars in capital, and purchased a minority interest in the Washington Capitals hockey club for a quarter million dollars.[13]

Markowitz appears to have financed this spree at least in part by diverting partnership opportunities to himself. Most of the funds used to exploit the opportunities came from two entities owned by Markowitz: the Monetary Group, N.V. ("N.V."), a Netherlands Antilles corporation, and the Monetary Group Government Securities ("GSI"), an American corporation.[14] These two entities in turn acquired most of their assets from securities transactions with Hillcrest Equities, Inc., an entity that had originally traded with TMG II and perhaps TMG Associates as well.[15] By July, Hillcrest was trading exclusively with N.V. and then with GSI.[16] Markowitz admits that he instigated this switch entirely "for purposes of [his] own enrichment." [17]

Most importantly, from the perspective of the Partnerships' limited partners, Markowitz's transactions failed to produce legitimate tax losses. As early as 1981, Price Waterhouse, TMG Associates' original auditor, suspected that the Partnerships were not engaged in bona fide transactions.[18] In fact, the only thing that Markowitz bought or sold was documentation. The Partnerships paid its so-called trading partners "for the fraudulent documentation ... provided to substantiate the fictitious losses that TMG Associates passed on to its limited partners." [19] Similarly, the Partnerships, as well as N.V. and GSI, received commissions not for trading in securities but rather "for the fraudulent documentation" of "more than $350 million in false interest expenses." [20]

By 1983, both the Government and the Partnerships were closing in on Markowitz. Early in the year, the IRS opened an inves-

§ I, at 1 (Second Strzegowski Declaration, Exhibit B).

7. *See* Letter from Barry M. Rosenblatt to Irwin Terach, December 3, 1980 (First Strzegowski Declaration, Exhibit A); *see also United States v. Oshatz*, 912 F.2d at 536 (describing how the Partnerships were supposed to generate tax savings through "straddle" and "repurchase" transactions).

8. *See* Stipulation of Facts, filed March 13, 1990 ¶ 3 [hereinafter, "Stipulation"].

9. *See* First Strzegowski Declaration ¶ 6; *see also* Information ¶ 21 (noting that Markowitz generated $60 million in deductions for the five limited partnerships, including TMG Associates and TMG II, operated by him).

10. *See* Stipulation ¶ 4.

11. *See id.* ¶ 41.

12. *See id.* ¶ 7.

13. *See id.* ¶¶ 26, 30–36, 38–40.

14. *See id.* ¶¶ 10–24.

15. *See id.* ¶¶ 10–15 (N.V.); *id.* ¶¶ 24–25 (GSI).

16. *See id.* ¶ 10.

17. *See id.* ¶ 10.

18. *TMG II v. Price Waterhouse & Co.,* —— A.D.2d ——, ——, 572 N.Y.S.2d 6, 7 (1991) (noting that Price Waterhouse withdrew "after TMG was unable to document to Price Waterhouse's satisfaction that the transactions [recorded in TMG's books] were bona fide, and actually occurred").

19. Information ¶ 23.

20. *Id.* ¶ 29.

tigation of Markowitz.[21] The partners in TMG II were, however, the first to institute legal action. On November 15, 1983, apparently in response to the IRS investigation, Markowitz resigned as general partner of both TMG Associates and TMG II.[22] A little less than a month later, Donald Weil, the remaining general partner in TMG II, sued Markowitz, alleging that Markowitz had breached his fiduciary duties to the Partnership by improperly appropriating the opportunity to trade with Hillcrest, by using Partnership employees for his own benefit, by converting Partnership funds to purchase, among other things, the stables and the houses for himself and for his sister, and by making improper loans to himself from the Partnership. A similar complaint, filed six months later by an *ad hoc* committee of TMG Associates limited partners, was consolidated with *Weil v. Markowitz,* and after a four month delay of the proceedings requested by the United States Attorney for the Southern District of New York and several more months of negotiation, the parties reached a compromise embodied in an Order of August 30, 1985.[23] According to the terms of the order, Markowitz and several of his wholly owned corporations agreed to the entry of a judgment against them in the amount of $897,177.96 representing a "full accounting, in equity, for specific Partnership property, including funds, that were entrusted to Mr. Markowitz in his fiduciary capacity as general partner." [24] TMG II and TMG Associates agreed in return to release all related claims against Markowitz and his corporations.[25] The agreement did not in any way affect the rights of limited partners,[26] many of whom

would later claim to have lost both the equity they invested in the Partnerships and the tax deductions that they took between 1980 and 1982.[27]

Although the Partnerships were able to file suit before the Government, the Government drew first blood: After filing its lien against Markowitz in January, the IRS was able, in the next six months, to seize approximately $450,000 from bank accounts owned or controlled by Markowitz.[28] After entry of the Order of August 30, 1985 and the filing of the instant complaint, Markowitz voluntarily surrendered to the IRS approximately $270,000, constituting the proceeds from the sale of his home at 2323 Porter Street, the Rolls Royce, the Ford Bronco, and his stock in TMG Securities, as well as $5,000 from a Swiss bank account.[29] Finally, in 1988, the IRS received, from an escrow account established in *Weil v. Markowitz,* over $500,000 from the sale of the house at 2329 Porter Street bought for Markowitz's sister.[30]

The Partnerships filed the instant action in August of 1985—after the IRS filed its tax liens and levied upon Markowitz's bank accounts but before the surrender of the other assets. They alleged that their claims against Markowitz for fraud and for breach of fiduciary duty had priority over the IRS's claims against Markowitz for delinquent taxes. Plaintiffs also originally sought to recover any surplus from the tax levies and to estop the United States from denying the priority of their claims.

In the six years since this action was filed, the latter two claims have been abandoned. It is now clear that the tax levies did not produce a surplus; while the IRS

**21.** *See* Second Strzegowski Declaration ¶ 4.

**22.** *See* Amended Complaint ¶¶ 3, 8; Answer to First Amendment Complaint ¶¶ 3, 8.

**23.** *See also* Memorandum of October 2, 1985, *Weil v. Markowitz,* Nos. 83–3684 & 84–1680 (explaining the Order of August 30, 1985); *Weil v. Markowitz,* 829 F.2d 166 (D.C.Cir.1987) (upholding that order in pertinent part).

**24.** Order of August 30, 1985, at 4.

**25.** *See id.* at 6.

**26.** *See id.* at 8.

**27.** *See, e.g., Silverman v. Weil,* 662 F.Supp. 1195, 1197 n. 2 (D.D.C.1987); *TMG II v. Price Waterhouse & Co.,* —— A.D.2d at ——, 572 N.Y.S.2d at 6.

**28.** *See* Plaintiffs' Statement of Material Facts, Document 1.

**29.** *See* Stipulation ¶¶ 1(b), 1(k)–(n), 2; Plaintiffs' Statement of Material Facts, Document 1.

**30.** *See* Stipulation ¶¶ 1(a), 2.

claims Markowitz owes over $5 million in back taxes, it has been able to recover less than a third of that amount.[31] The estoppel claim has also been resolved. The Partnerships contended that the Government should be estopped from denying the priority of their claims because it improperly delayed entry of judgment against Markowitz in *Weil v. Markowitz*.[32] This claim was considered and rejected when the plaintiffs in *Weil v. Markowitz* sought to enter the Order of August 30, 1985 *nunc pro tunc*, to before the filing of the Government's liens in January of 1985. *See Weil v. Markowitz*, 898 F.2d 198, 201–02 (D.C.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 68, 112 L.Ed.2d 42 (1990); *see also* Revised Order of March 10, 1988 (consolidating this matter with *Weil v. Markowitz* for the limited purpose of resolving the motion for entry of the consent order *nunc pro tunc*).

As a consequence, the only remaining issue in this action is whether the Partnerships' claims against Markowitz have priority over the Government's claims. This issue has also been refined since the filing of the original complaint. The Partnerships now claim that they have superior title to fourteen specific assets seized or recovered by the IRS. Even so limited, resolution of this claim is far from simple.

## II.

▮ Before considering the substance of the matter, it is first necessary to determine whether this Court has jurisdiction over all aspects of the claim. Congress has waived its sovereign immunity in suits alleging wrongful levies by the IRS. *See* 26 U.S.C. § 7426(a)(1) (1988).[33] As a consequence, this Court clearly has jurisdiction over the assets seized by the IRS from Markowitz's bank account during the early part of 1985. *See supra* p. 41. Congress has also consented to actions to "quiet title to ... real or personal property on which the United States has or claims a mortgage or other lien." 28 U.S.C. § 2410(a)(1).[34] On August 2, 1985, when the instant complaint was filed, the United States had liens on all of the other assets now claimed by the Partnerships. It would, therefore, appear that this Court has jurisdiction over those claims as well. The Government, however, contends that since those assets were later voluntarily surrendered to the IRS, this Court no longer has jurisdiction over claims concerning them. This contention is not persuasive.

The Government correctly notes that the waiver of sovereign immunity in 28 U.S.C. § 2410(a) does not apply when, at the commencement of litigation, the property at issue is in the possession of the United States. *See, e.g., Trustees of the Puritan Church v. United States*, 294 F.2d 734 (D.C.Cir.1961) (per curiam). There is, however, no precedent for the claim that the IRS may *strip* a federal court of jurisdiction under § 2410 by the simple expedient of obtaining possession of the property. Quite to the contrary, all three circuits that have considered this contention have rejected it. *See Kulawy v. United States*, 917

---

**31.** *See* Plaintiffs' Statement of Material Facts ¶ 4.

**32.** *See* Amendment Complaint ¶¶ 37–53.

**33.** That section provides in full:

If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary.

**34.** That section provides in full:

Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, or in any State court having jurisdiction of the subject matter—
(1) to quiet title to,
(2) to foreclose a mortgage or other lien upon,
(3) to partition,
(4) to condemn, or
(5) of interpleader or in the nature of interpleader with respect to,
real or personal property on which the United States has or claims a mortgage or other lien.

F.2d 729, 734 (2d Cir.1990); *Delta Savings & Loan Assoc. v. Internal Revenue Service*, 847 F.2d 248, 249 n. 1 (5th Cir.1988); *Bank of Hemet v. United States*, 643 F.2d 661, 665 (9th Cir.1981).

Moreover, this rejection rests upon a sound reading of the statute. Simply put, there is "nothing in § 2410(a)(1) that permits the government to oust [a] court of jurisdiction validly invoked." *Kulawy v. United States*, 917 F.2d at 733–34 (citation omitted). Nor is there any reason to suppose that Congress intended to give the Executive Branch such power. "The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed.*" *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 109 S.Ct. 2218, 2222, 104 L.Ed.2d 893 (1989) (citation omitted) (emphasis added). As a consequence, § 2410(a) is most naturally read to condition the waiver of sovereign immunity on the circumstances at the time the complaint is filed. Indeed, the Government's interpretation would defeat Congress' apparent purpose in consenting to quiet title suits. By consenting to such suits, Congress indicated that it wished title disputes to be resolved by law, not by brute force. The Government's interpretation would, however, give the IRS the power "to manipulate its position subsequent to the filing of the complaint" so as to bar potentially meritorious claims. *Bank of Hemet v. United States*, 643 F.2d at 665. Absent a clear indication to the contrary, Congress should not be presumed to have intended such an irrational and unjust result. *See, e.g.,* Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv.L.Rev. 405, 482 (1989).

■ In the alternative, the Government contends that plaintiffs' claims are barred because § 2410 does not authorize the recovery of money damages. *Cf. Lehman v. Nakshian*, 453 U.S. 156, 161, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1980) (noting that "this Court has long decided that limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied") (quotation and quo-

tation marks omitted). Be that as it may, nothing bars plaintiffs from receiving a declaratory judgment of their rights which might serve as the basis for a claim of conversion or from seeking some form of equitable relief. So, even if it is assumed that the Partnerships' remedies are limited, nothing prevents them from establishing their right to the assets in question.

### III.

The Government asserts that it has a superior claim to the assets claimed by the plaintiffs based upon the tax liens filed in January, 1985. According to the Government, those liens have priority over the subsequent judgment obtained by TMG Associates and TMG II in *Weil v. Markowitz*. This contention is correct, but it does not resolve the case.

■ "Federal tax liens are wholly creatures of federal statute," *United States v. Brosnan*, 363 U.S. 237, 240, 80 S.Ct. 1108, 1110, 4 L.Ed.2d 1192 (1960), and under federal law such liens may, with several exceptions not applicable here, be "primed" only by a previously and properly filed lien. *See, e.g., United States v. New Britain*, 347 U.S. 81, 85, 74 S.Ct. 367, 370, 98 L.Ed. 520 (1954). To be properly filed, a lien must be "choate." In other words, "the identity of the lienor, the property subject to the lien, and the amount of the lien" must all be established and nothing more left to be done to perfect the lien. *Id.* at 84, 74 S.Ct. at 367. The judgment lien in *Weil v. Markowitz* clearly fails to satisfy this standard. Although the complaints consolidated into that action were filed fully six months before the United States filed its lien against Markowitz on January 14, 1985, the Partnerships did not obtain a judgment against Markowitz in a specific amount until August 30 of that year. *See* Order of August 30, 1985 at 4. Moreover, as noted above, the Partnerships' request to have that order entered *nunc pro tunc* has been denied. *See supra* p. 42. As a consequence, the United States is entirely correct in arguing that its tax liens have priority over the plaintiffs' judgment liens.

It does not, however, follow that the Partnerships' claim to the fourteen assets at issue here must be dismissed. Tax liens may attach only to "property . . . belonging to [the taxpayer]." 26 U.S.C. § 6321.[35] They "cannot extend beyond the property interests held by the delinquent taxpayer." *United States v. Rodgers*, 461 U.S. 677, 690–91, 103 S.Ct. 2132, 2140–41, 76 L.Ed.2d 236 (1983). Thus, if the Partnerships can show that at the time the Government filed its liens they, not Markowitz, were the true owners of the fourteen assets, they can establish their entitlement to those assets. *See, e.g., United States v. Durham Lumber Co.*, 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960). Moreover, in order to do so, the plaintiffs need not show that they had legal title to those assets. They need only show that they had a beneficial interest in those assets sufficient to give them equitable title under state law. *See, e.g., Dennis v. United States*, 372 F.Supp. 563 (E.D.Va.1974); *see also Acquilino v. United States*, 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960) (noting that "state law controls in determining the nature of the legal interest which the taxpayer had in the property sought to be reached by the statute") (quotation, quotation marks, and footnote omitted).

The Partnerships contend that in tax lien cases the burden of proof shifts to the Government. *See* Plaintiff's Opposition at 27; Plaintiff's Reply at 15. This contention is based primarily upon the authority of a Ninth Circuit decision, *Flores v. United States*, 551 F.2d 1169 (9th Cir. 1977). The contention is not persuasive. Both the facts and the reasoning in that case are easily distinguishable.

As in this case, in *Flores* a third party challenged a tax lien filed upon what the IRS contended was the property of a delinquent taxpayer. However, in contrast to this case, in *Flores* the Government seized property from the possession of the third party. *See id.* at 1171. The Ninth Circuit

reasoned that in such a situation the Government should for two reasons bear the burden of proving that the property belonged to the delinquent taxpayer. First "the Internal Revenue Service needs probable cause at the time assets are initially seized to connect these assets to a taxpayer with outstanding taxes due." *Id.* at 1174–75 (footnote omitted). It then reasoned that

> [s]ince the Internal Revenue Service has this obligation in any event, it seems highly appropriate for the Government to bear the burden of persuasion on what is really the identical question raised by the terms of the statute—whether the levy is wrongful because the taxpayer has no interest in the property.

*Id.* at 1175. Second, the *Flores* Court found that it would be unfair to force the third party to establish that the taxpayer did not own the property because of the difficulties of proving "a negative fact about which he had absolutely no information." *Id.* & n. 7.

Neither of these rationales applies to this case. Because the property seized from Markowitz was in his possession, the nexus between the delinquent taxpayer and the property is obvious, and there is no need for the IRS to present additional evidence in order to satisfy their constitutional obligations. More importantly, in this case, the Partnerships would not be prejudiced by assuming the plaintiff's normal burden of proof: "In most situations, the plaintiff has the burden of proving his case, so it is not exceptional to expect a plaintiff attacking a tax levy to prove that the property was his own." *Minges v. United States*, No. H–75–186, at *2, 1981 WL 1763 (D.Conn. March 30, 1991) (LEXIS, Genfed Library, District Court Library). Indeed, in *Flores* the Ninth Circuit recognized that its ruling did not extend to this situation. *See Flores*, 551 F.2d at 1176 n. 8 (expressly reserving judgment on whether the burden of proof would shift to the Government where "the plaintiff makes a claim to the

---

**35.** Section 6321 provides in relevant part:

   If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the

United States upon all property and rights to property, whether real or personal, *belonging to such person.*

   26 U.S.C. § 6321 (1988) (emphasis added).

property derivatively from the taxpayer"). Indeed, when finally faced with a case like this one, the Ninth Circuit placed the burden of proof on the plaintiff challenging the tax lien. *See Arth v. United States,* 735 F.2d 1190, 1193 (9th Cir.1984); *see also Valley Finance, Inc v. United States,* 629 F.2d 162, 171 n. 19 (D.C.Cir.1980) (suggesting that once the Government has proven the nexus between the property seized and the taxpayer the burden of persuasion returns to the plaintiff challenging the levy). Thus, while the Partnerships may prove their case by proving that they have equitable title to the assets seized, they must bear the burden of doing so.

## IV.

■ The Partnerships contend that under District of Columbia law "an errant general partner, like Mr. Markowitz, is deemed to own no property of his own until all property due and owing the partnership has been accounted for and restored." Plaintiffs' Motion for Summary Judgment at 9. They draw this proposition from *Moyers v. Cummings,* 17 App.D.C. 269 (1900), *aff'd sub nom. Consul v. Cummings,* 222 U.S. 262, 32 S.Ct. 83, 56 L.Ed. 192 (1911), a decision rendered by the old Court of Appeals for the District of Columbia in 1900 that has not been previously cited by another court. Even if this derelict case is presumed to have precedential value, plaintiffs' contention must be rejected because their interpretation of *Moyers* is demonstrably incorrect.

*Moyers* involved a dispute between Gilbert Moyers and the estate of his former partner, George Edmonds. Moyers and Edmonds had agreed to cooperate in certain cases before the United States Court of Claims and split the fees from those cases 50–50. *See Moyers,* 17 App.D.C. at 270–71. After Edmonds' death, the administrator of his estate sued alleging that Moyers had collected some $26,000 in fees due the partnership and "deposited the same in [his] bank in his own name and . . . commingled them with his own funds." *Id.* at 271. The estate requested, among other things, that the trial court appoint a receiver for the partnership and order Moyers to

surrender partnership property including the fees, to that receiver. *See id.* at 271–72. The lower court concurred, and it ordered Moyers to deliver to the receiver "from the moneys heretofore collected by him on account of the fees paid by the claimants in the partnership claims. . . . the sum of nine thousand dollars." *Id.* at 275.

Moyers did not contest that he owed money to the partnership. He did, however, contest the authority of the lower court to order him to deliver funds from his bank account. He began by observing that receivers may only be authorized to take into custody "property which is the subject of litigation." *Id.* at 276. He then asserted that the funds in his bank account were his own, and not the property of the partnership. Thus, according to Moyers, while Edmonds' estate could file a judgment lien against him to secure his liability, it had no right to demand a specific asset like his bank account. His liability, "if it exists, is not as trustee, but as a simple debtor." *Id.*

The D.C. Court of Appeals rejected this argument. It found that

> [i]f [Moyers] in fact collected money due the partnership, mingled it with his own and deposited the whole in a bank in his own name, such of it as he may have had at the time of the order would clearly be subject thereto.

*Id.* at 279. The D.C. Court of Appeals recognized that, because two years had elapsed since the funds were deposited there, it would be nearly impossible to prove that the exact funds paid by the debtors of the partnership were still in Moyers' bank account. It ruled, however, that "[h]is relation was so far fiduciary, at least that in mingling the fund with his own and drawing thereon on his individual account, he will be presumed to have first drawn and used his own money." *Id.* (citation omitted). The court then proceeded to consider the evidence presented by Edmonds. Finding no evidence to rebut the presumption that the remaining money represented the partnership's funds, it then affirmed the lower court's decree. *Id.* at 280–81.

The Partnerships interpret this decision to announce that "equity regards *all* property in the general partner's hands as partnership property." Plaintiffs' Motion for Summary Judgment at 11 (emphasis in original). They base this interpretation primarily upon the following passage:

Consequently, so much of the fund remaining undrawn and unconverted in fact, as may not be in excess of the collection of partnership dues, will be regarded in equity as the property of the partnership.

*Moyers*, 17 App.D.C. at 279. The passage, however, refers only to "the fund," not to all of Moyers' property as the Partnerships contend. Indeed, in the very next sentence the D.C. Court of Appeals indicated that it was only concerned with funds that were at least arguably the Partnerships': It declared that "[t]he identity of the fund is not lost by the act of commingling." *Id.* at 279 (citation omitted). This reasoning is clearly incompatible with the Partnerships' proposition that all of an errant fiduciary's property is considered the partnership's until the debt to the partnership has been restored.

Moreover, the Partnerships' interpretation of *Moyers* is incompatible with the case's holding. The D.C. Court of Appeals did not stop, as it would have under plaintiffs' principle, with a finding of a breach of fiduciary duty and then deem Moyers' property to be the partnership's. Instead, it proceeded to determine whether the evidence showed that the funds in the bank account were traceable to the partnership. It is true that because of the presumption it imposed the scales were weighted in favor of finding the funds in the commingled account to be partnership funds. Nevertheless, the D.C. Court of Appeals left open the possibility that Moyers could defeat that presumption by showing that the funds were not traceable to the partnership. Indeed, it held that "[u]pon satisfying the court that he did not have the money or any part of it, in his possession or under his control, direct or indirect, he could secure a modification of the order with a complete or partial discharge of the rule...." *Id.* at 281.

In short, *Moyers* was a narrow decision. *Cf. id.* at 278–79 (not finding it necessary to consider whether a constructive trust was created given "the view that we have taken of those facts"). The D.C. Court of Appeals held that partnership property commingled in a fiduciary's account with other funds will be presumed to remain in that account and found that Moyers had failed to rebut that presumption. The Partnerships' attempt to read a broader principle into the case ignores both its reasoning and its holding and must be rejected.

Because of the conclusion reached here, there is no conflict between District of Columbia and New York law and, consequently, no need to consider the Government's claim that New York law controls.

V.

■ In the alternative, the Partnerships argue that Markowitz's breach of the fiduciary duties he owed to them created a constructive trust in their favor. As the Government concedes, tax liens do not attach to properties subject to a constructive trust because, while the taxpayer may have legal title, the constructive trust gives its "beneficiary" equitable title. *See, e.g.,* *United States v. Fontana*, 528 F.Supp. 137 (S.D.N.Y.1981); *Atlas, Inc. v. United States*, 459 F.Supp. 1000 (D.N.D.1978); *First Nat'l Bank of Cartersville v. Hill*, 412 F.Supp. 422 (N.D.Ga.1976); *Dennis v. United States*, 372 F.Supp. 563 (E.D.Va. 1974). The Government argues instead that no constructive trust was created, or, in the alternative, that it does not extend to the assets in question. Finally, the Government argues that even if a constructive trust were created over those assets, it would arise too late to defeat the Government's tax liens.

A.

A constructive trust is essentially an equitable construct. As Justice Cardozo so eloquently put it,

[a] constructive trust is the formula through which the conscience of equity

finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. *Beatty v. Guggenheim*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (citation omitted). The Partnerships contend that a constructive trust was created when Markowitz defrauded the investors in the Partnerships. In the alternative, they contend that a constructive trust was created when Markowitz resigned from TMG Associates and TMG II without properly accounting for specific partnership property entrusted to him as general partner. *See supra* p. 41. The latter contention is persuasive. .

■ The first one is not. In the first place, it is by no means clear that either the Partnerships or the limited partners proceeding derivatively on behalf of TMG Associates, have standing to claim that investors in the Partnerships were defrauded. Second, the Partnerships fail to present evidence supporting all elements of the fraud. Although Plaintiffs note that Markowitz was convicted of engaging in illegal transactions and that the placement memoranda for the Partnerships indicated that the Partnerships would engage in legal transactions, *see* Plaintiff's Motion for Summary Judgment at 14–15, they do not present any evidence that Markowitz made intentional misrepresentations. It is hornbook law that to prove fraud one must prove "knowledge or belief on the part of the defendant that the representation is false." D. Dobbs, R. Keeton, W. Keeton & D. Owen, *Prosser and Keeton on Torts* § 105, at 728 (5th Ed.1984) (student edition). Plaintiffs have failed to provide any evidence that at the time the limited partners invested in the Partnerships Markowitz intended to engage the Partnerships in illegal transactions. As the Supreme Court has noted,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Third, even if plaintiffs could prove fraud, they have utterly failed to trace any of the capital initially contributed to the Partnerships to the assets now in the Government's hands. *See infra* pp. 47–48. Thus, a constructive trust may not be created on the theory that Markowitz defrauded the limited partners.

■ The Partnership's other theory is more promising. It is well-settled that a breach of fiduciary obligations may give rise to a constructive trust. *See Hertz v. Klavan*, 374 A.2d 871, 873 (D.C.1977); *Miller v. Merrell*, 53 N.Y.2d 881, 884, 423 N.E.2d 43, 44, 440 N.Y.S.2d 620, 621 (1981); *see generally* Restatement of Trusts § 190, at 780 (1937). It is equally clear that as the general partner of TMG Associates and TMG II Markowitz owed a duty to both the limited partners and the partnership as a whole to act in a fiduciary capacity. *See Riviera Congress Assoc. v. Yassky*, 18 N.Y.2d 540, 547, 223 N.E.2d 876, 879–80, 277 N.Y.S.2d 386, 392 (1966); *Libby v. LJ Corp.*, 247 F.2d 78, 81 (D.C.Cir.1957). One of Markowitz's duties was to carefully account for all partnership property. *See* D.C.Code § 41–210(a)(2) (1986); N.Y. Partnership Law § 99(1)(b) (McKinney 1988); *see generally* A. Bromberg, *Crane and Bromberg on Partnership* §§ 67–68, at 386–97 (1968) (Hornbook edition). It is undisputed that "as of November 15, 1983, the day Mr. Markowitz resigned his general partnership" in both TMG Associates and TMG II, he had not "fully accounted for, repaid or returned" to the Partnerships the "specific partnership property, including funds, that were entrusted to Mr. Markowitz in his fiduciary capacity as general partner." Order of August 30, 1985 at 4. It, therefore, follows that Markowitz breached his fiduciary duties toward the Partnerships and that if he possesses any partnership property unaccounted for on November 15, 1983, he is not only likely guilty of embezzlement; the property taken by him is also subject to a constructive trust in favor of the Partnerships.

### B.

The plaintiffs do not contend that they ever held title to the fourteen assets either seized or recovered by the United States from Markowitz. Instead, they claim that under D.C. law all property of an errant fiduciary is impressed with a constructive trust. By contrast, under New York law it is clear that a constructive trust may only be imposed over property actually taken from the trust's "beneficiary" or traceable to such property. *See, e.g., Fur & Wool Trading Co. v. George I. Fox, Inc.,* 245 N.Y. 215, 218, 156 N.E. 670, 671 (1927); *Ferris v. Van Vechten,* 73 N.Y. 113 (1878). Not surprisingly, the parties have invested considerable effort in arguing which state's law controls. It is not, however, necessary to resolve this choice-of-law question because there is no actual conflict between New York and D.C. law. The Partnerships' interpretation of D.C. law is simply incorrect.

Tracing is based upon the importance of identification: "In order to obtain a constructive trust, the plaintiff must identify specific property as the res of the trust to which he is entitled." G. Bogert & G. Bogert, *The Law of Trusts and Trustees* § 471, at 9 (2d Rev.Ed.1978) (footnote omitted) [hereinafter, *"Bogert on Trusts"*]. On a conceptual level, identification of particular property makes sense because it would be anomalous to talk of a trust without having a res. The real virtue of identification is, however, more practical. It allows the beneficiary of a constructive trust to argue that the property in question was first his or hers and to claim, based upon the principle of first in time first in right, a priority over other creditors of the wrongdoer. *See* V A.W. Scott, *The Law of Trusts* § 521, at 3649 (3d ed. 1967) [hereinafter, *"V Scott on Trusts"*]. This principle holds even when the property in question is converted because "[i]t is a fundamental principle in the English common law that a change of form in a thing does not change the ownership." *Bogert on Trusts* § 921, at 364–66; *see* V *Scott on Trusts* § 508.2, at 3580. The identification principle has even been extended to the situation addressed in *Moyers*—the commingling of

funds—and, as in *Moyers,* courts have presumed that the wrongdoer spends his or her funds first. *See* Restatement of Restitution § 212, at 856; *Bogert on Trusts* § 926, at 407–08; V *Scott on Trusts* § 518, at 3635. The principle does, however, have its limits: Thus, it is clear that one must be able, at the very least, to trace funds into a commingled account. In the absence of such proof, courts have refused to enforce a constructive trust. *See, e.g., Nat'l City Bank v. Hotchkiss,* 231 U.S. 50, 57, 34 S.Ct. 20, 21, 58 L.Ed. 115 (1913) (Holmes, J.); Restatement of Restitution § 215, at 866.

Although no recorded District of Columbia case turns upon the requirement of tracing, there is no reason to think that the D.C. courts would depart from these general and well-accepted principles. Under Maryland law, "the source of the District's common law and an especially persuasive authority when the District's common law is silent," *Napoleon v. Heard,* 455 A.2d 901, 903 (D.C.1983), it is well-established that the would-be beneficiaries of a constructive trust must trace. *See, e.g., Brown v. Coleman,* 318 Md. 56, 68–71, 566 A.2d 1091, 1097–1101 (Md.1989); *Drovers' & Mechanics' Nat'l Bank v. Roller,* 85 Md. 495, 498, 37 A. 30, 32 (1897). In 1985, Judge Harold Greene sitting in diversity jurisdiction found the D.C. Court of Appeals likely to require tracing. *See, e.g., In re Auto–Train Corp.,* 53 B.R. 990, 996–97 (1985). More importantly, the D.C. Court of Appeals recently suggested that it would require tracing. In *Benvenuto v. Dechillo,* the D.C. Court of Appeals noted that "the gravamen of appellees' complaint, and a key consideration in our affirmance here, is the attempt to trace the funds held in the trust for them into its product, real estate in the District of Columbia." *Benvenuto v. Dechillo,* 586 A.2d 1225, 1227 (D.C.1991) (footnote omitted). Although the question of tracing was not technically before the *Benvenuto* Court, the D.C. Court of Appeal nevertheless assumed tracing to be required in resolving the appellant's *forum non conveniens* argument. It is unlikely that the D.C. Court of Ap-

peals would have done so if it had serious misgivings about the tracing requirement.

Moreover, the Partnerships fail to cite a single case in which a court has directly rejected the tracing requirement. Instead, they attempt to extrapolate a rejection of the tracing requirement from their interpretation of *Moyers*. However, as discussed above, *see supra* pp. 45–46, in *Moyers*, the D.C. Court of Appeals upheld the lower court's decision on the ground that the partnership's fees had gone into Moyers' bank account and Moyers had failed to prove that the fees were no longer there. Moreover, the Court offered Moyers the opportunity to show that partnership funds could not be traced into his bank account. *See supra* p. 46. Thus, *Moyers,* in effect, imposed a tracing requirement on the plaintiffs.

The Partnerships also argue that the tracing requirement should be abandoned on "policy" grounds. First, they argue that "tracing is an unrealistic requirement in a world where, increasingly, monetary assets have no physical existence." Plaintiffs' Opposition at 22. The Partnerships fail, however, to suggest how they can claim priority over other creditors once the principle of identification has been abandoned. They might logically argue that victims of a breach of fiduciary duty should be distinguished from general creditors on the basis of the greater harm done to them. It is, however, unlikely that the D.C. Court of Appeals would accept that distinction as a basis for prioritizing their claims: As Scott notes in his treatise, "no court has gone so far as to base priority merely upon the character of the wrong done." V *Scott on Trusts* § 521, at 3648.

In the alternative, plaintiffs argue that no principled distinction can be drawn between funds commingled in a particular account and funds commingled in the wrongdoer's estate because in both cases the original res loses its separate identity. In their view, the extension of the identification principle to include commingled funds should itself be extended to include all property. In short, they argue that the tail should wag the dog. Given the moral ambiguities connected with tracing to a commingled fund, the more logical response to the inability to distinguish commingling in a particular account from commingling in the wrongdoer's estate would be to deny recovery in both cases. It is, however, possible to distinguish between the two situations. While it is true that once funds are commingled, and the wrongdoer withdraws and deposits other funds in the account the particular funds taken from the would-be beneficiaries cannot be definitively shown to remain, it is equally true that they cannot be proven to be absent. Thus, the would-be beneficiary can point to a particular fund and defy other's to prove that he is not entitled to a portion of that fund. A general creditor has no such ability. Thus there is a difference, albeit a slender one, between the commingling of funds in a particular account and commingling with the wrongdoer's assets in general, and that difference is a sufficient basis on which to distinguish the beneficiaries of a constructive trust and a general creditor. Moreover, if *Moyers* is any indication, it is likely that the D.C. Court of Appeals would accept this distinction; in that case, far from determining that the partnership fees, once commingled, were indistinguishable, the Court of Appeals held that "[t]he identity of the fund is not lost by the act of commingling." *Moyers,* 17 App.D.C. at 279 (citation omitted).

Finally, the Partnerships argue that tracing should be dispensed with in this particular case because the United States "stands in the taxpayer's shoes." They posit the following syllogism:

(1) The United States stands in Markowitz's shoes;

(2) Markowitz is required by the Order of August 30, 1985 to compensate the Partnerships for unaccounted-for partnership property;

(3) Therefore, the United States is required to compensate the Partnerships.

The problem with this syllogism, as with most syllogisms, lies in its premise. Plaintiffs derive this premise from a commentator's *bon mot* quoted in a parenthetical in footnote sixteen of *United States v. Rodg-*

*ers:* "[T]he tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out." *United States v. Rodgers*, 461 U.S. 677, 691 n. 16, 103 S.Ct. 2132, 2141 n. 16, 76 L.Ed.2d 236 (1983) (quoting 4 B. Bittker, *Federal Taxation of Income, Estates, and Gifts* ¶ 111.5.4, at 111–102 (1981)). Bittker's metaphor describes the doctrine, mentioned above, that state law determines whether a taxpayer has a sufficient property interest for federal tax liens to attach. *See supra* 14; *see generally Acquilino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960). The incorporation of state law stops, however, once the liens attach: As discussed in the text of the *Rodgers* opinion, "it has long been an axiom of our tax collection scheme that, although the definition of underlying property interests is left to state law, the consequences that attach to those interests is a matter left to federal law." *Rodgers*, 461 U.S. at 683, 103 S.Ct. at 2137 (citation omitted). Thus, Bittker's barefoot metaphor only applies to the question of attachment. Moreover, if it were extended any further, the result would be absurd. Since a taxpayer's claims are subordinated to all creditors, general and specific alike, under the Partnerships' logic, United States tax liens would be inferior to the claims of each and every creditor of the taxpayer.

In sum then, the overwhelming and uncontradicted weight of authority is that the beneficiary of a constructive trust must trace all property covered by the trust to property improperly taken from the beneficiary. This principle is clearly established under New York law, and the D.C. Court of Appeals has indicated that it accepts this principle as well. Nor is the D.C. Court of Appeals likely to be swayed by plaintiffs' demonstrably flawed policy arguments. Thus, whether D.C. or New York law applies, plaintiffs must trace all property upon which they wish this Court to enforce a constructive trust.

### C.

■ The Partnerships contend that an injunction issued in *Weil v. Markowitz* on February 23, 1984, that effectively froze Markowitz's assets satisfies the tracing requirement. The Partnerships do not, however, explain why that injunction gives their claims priority over other creditors. Instead, they rely entirely upon what they interpret to be the holdings of two cases, *United States v. Fontana*, 528 F.Supp. 137 (S.D.N.Y.1981) and *SEC v. Paige*, 1985 WL 2335 (D.D.C. July 30, 1985). Their interpretation of these cases is, however, utterly without basis.

In *Paige*, the Court found that assets seized by the IRS could be traced back to the would-be beneficiary of the constructive trust. Specifically, Herbert Paige embezzled funds from General Cinema Corporation (GCC) and as a consequence of a suit by GCC to recover those funds, a permanent injunction established an escrow fund. *SEC v. Paige*, 1985 WL 2335, at *2–*3 (Stipulation of Facts ¶¶ 6–13). "The escrow assets were purchased by Paige with funds from the same general personal checking accounts into which he had deposited the [embezzled funds]." *Id.* at *3 (Stipulation of Facts ¶ 13). Thus, when the IRS levied upon the fund, the Court had no difficulty in finding that Paige had "no legal right or interest in the escrow assets previously turned over to the government to satisfy Paige's federal tax liability," that those funds were held in constructive trust for GCC, and that the IRS's liens filed against Paige could not, therefore, attach to the escrow fund. *Id.* at *7. Noting that the opinion does not discuss tracing, the Partnerships conclude that the issuance of the injunction creating the escrow fund dispensed with the need for tracing. The more natural reading is, however, that the Court never considered the effect of the injunction because the funds in the escrow account could be traced through his general personal checking accounts to the embezzled funds.

Similarly, in *Fontana*, the would-be beneficiaries' ability to trace was not at issue. That case had its ultimate origin in a suit filed by Great Lakes Carbon Corporation against Fred Fontana claiming that Fontana had violated his fiduciary obligations as an employee. *See United States v. Fonta-*

*na,* 528 F.Supp. at 139. In connection with its claim, Great Lakes filed a writ of attachment against Fontana, and some of his assets were seized by the Sheriff of Westchester County. *See id.* at 142. The United States later filed tax liens against Fontana and claimed the assets held by the sheriff. *See id.* Addressing the Government's motion for summary judgment, Judge Sands determined that he had subject matter jurisdiction and rejected the Government's contention that any constructive trust imposed would be defeated by the Government's prior filed lien. *See id.* at 146. The Court then observed that "[t]he question of fact whether Fontana's acts gave rise to a constructive trust for the benefit of Great Lakes remains unsettled." *Id.* Again noting that "nothing in *Fontana* indicates that the embezzled funds were traced into the attached bank accounts," plaintiffs contend that the writ of attachment satisfied the tracing requirement. *See* Plaintiff's Reply at 14. The opinion does, however, indicate that the embezzled funds can be traced: It specifically mentions that Great Lakes "has asserted ... that the fund in question is *traceable* to wrongful acts by Fontana in breach of his fiduciary obligations as an employee." *Id.* at 139. Thus, as with *Paige,* the most natural reading of *Fontana* is that tracing was not an issue—not that the Court used an injunction or a writ of attachment in lieu of normal tracing.

More fundamentally, the Partnerships fail to explain how or why a writ of attachment or injunction could substitute for actual tracing. It cannot be that an injunction by itself defeats a tax lien, because preliminary injunctions and writs of attachment are clearly not sufficiently choate to prime a federal tax lien. *See, e.g., United States v. Security Trust & Savings Bank,* 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53 (1950). Nor does an injunction identify property as belonging to the beneficiary and or in any way establish the priority of the would-be beneficiary's claim to the property. In short, lacking a persuasive grounding in any cases and entirely devoid of any rationale, plaintiffs' contention that the preliminary injunction issued in *Weil v.*

*Markowitz* satisfies the tracing requirement must be rejected.

## D.

The Partnerships' primary contention is that it can trace $424,846.94 in assets seized or recovered by the Government to the "TMG Associates Bonus Account" at the NS & T Bank in Washington. With one exception, the Government concedes and indeed has stipulated that these assets can be traced to the TMG Associates Bonus Account. It asserts, however, that the money in that account did not belong to TMG Associates, but rather to one of Markowitz's wholly owned corporations, the Monetary Group, N.V. The Partnerships, of course, dispute this assertion. It is not, however, necessary to resolve this dispute because even if the Partnerships were to prove that the assets in the TMG Associates Bonus Account were theirs, they could not recover them through a constructive trust.

It is undisputed that in April, 1982, Edward Markowitz opened a bank account titled TMG Associates Bonus Account on behalf of TMG Associates by depositing a check in the amount of $130,000. *See* Markowitz Declaration ¶ 3. According to Markowitz, this account was to be used "to pay bonuses to employees of TMG Associates" and, indeed, bonuses totalling $53,872.90 were paid to TMG Associates employees. *Id.* ¶¶ 3–5. The remaining $76,127.10 was then returned to TMG Associates on June 3, 1982. *See id.* ¶ 5. Second Strzegowski Declaration ¶ 5. Beginning June 1, 1982, and continuing until June 23, 1982, Hillcrest Associates, an entity that had previously traded with TMG II, deposited $597,-000 in the TMG Associates Bonus Account. *See* Stipulation ¶ 6; *see also* Government's Opposition at 20 n. 3 (noting a mistake in Stipulation's addition). On June 30, 1982, the TMG Associates Bonus Account was closed out and the money remaining in it transferred to an N.V. bank account into which subsequent commissions from Hillcrest were deposited. *See* Stipulation ¶¶ 10–12. Markowitz asserts that during June of 1982 Hillcrest was trading with

N.V. and that the TMG Associates Bonus Account was used simply "because it was an open account available for my use." Markowitz Declaration ¶ 8. The plaintiffs strenuously dispute this assertion, pointing out that Hillcrest had previously traded with the Partnerships and that Markowitz had previously professed not to remember anything about the TMG Associates Bonus Account.

One fact is, however, undisputed. The transactions with Hillcrest were a sham. Markowitz, whether through TMG Associates or N.V., "provided Hillcrest Securities with fraudulent trading losses in return for commissions." *Id.* ¶ 7. As a matter of fact, according to the Information to which he pleaded guilty, Markowitz supplied Hillcrest and other customers with over $350 million in false interest expenses. *See* Information ¶ 29. The Partnerships relied upon these facts in formulating their pleadings. For example, in addition to attaching the Information to their originally complaint, they also alleged that

> [t]he individuals and entities who purchased limited partnership interests in the partnerships had no knowledge or information that Mr. Markowitz intended to use the partnerships for non-existent, bogus or sham trading transactions. Had the individuals and entities been given such information, they would not have invested in the partnerships.

Amended Complaint ¶ 23. Now, however, the Partnerships claim that they have a right to the proceeds of these "non-existent, bogus or sham"—and, one might add, illegal—"transactions." Indeed, they are claiming not only that they have a right to the fruits of these transactions but also that this Court should exercise its equitable powers to enforce a constructive trust to secure for them those fruits.

The Partnerships brazenly assert that it is not "relevant that the validity of the Hillcrest transactions may be subject to legal challenge." Plaintiffs' Reply at 22. This is simply wishful thinking. A constructive trust is a "purely equitable device." *Osin v. Johnson*, 243 F.2d 653, 656 (D.C.Cir.1957). As a consequence, courts enjoy great latitude in determining whether or not to enforce a constructive trust. A court sitting in equity may, for example, refuse to enforce a constructive trust unless the nominal titleholder is reimbursed for expenditures made in connection with the res. *See* Restatement of Restitution § 177, comment c, at 719. Most pertinently, "[a] complainant seeking the establishment of a constructive trust is naturally subject to the ordinary rules of equity that he must come into court with clean hands...." *Bogert on Trusts*, § 472, at 51–52.

It is hard to imagine a plaintiff approaching the Court with more soiled hands than the plaintiffs. TMG Associates—not its partners who may have been defrauded by Markowitz and who may have lost their substantial investments, but the partnership itself—claims that it owns the illegal commissions paid by Hillcrest in June, 1982, and asks this Court to subordinate another creditor. In all good conscience, that cannot be done because the only way that plaintiffs can claim title over the Hillcrest commissions is to admit that they were actively engaged in bogus transactions designed to generate fraudulent tax losses. Or to put it another way, the Hillcrest commissions are the functional equivalent of property stolen by Markowitz from someone other than plaintiffs. Whoever may be the victim, to whom that property should be restored, it is not the plaintiffs. Equity should not enforce such a claim.

### E.

The Partnerships also claim that they can trace the funds used in 1981 to purchase Markowitz's 2323 Porter Street home to a Cayman Islands bank account with TMG Associates funds.

■ The Partnerships first made this claim in their July 11, 1990 Reply Brief. After the Government protested that these assertions contradicted the Partnerships' statement of material facts and that this belated proffer of evidence prejudiced its case, the parties were allowed to conduct additional discovery and submit supplemental memoranda. *See* Order of December

11, 1990, 1990 WL 290072; Order of September 24, 1990. While plaintiffs' supplemental memorandum filed on November 29, 1990, essentially repeated the claims asserted in its July 11, 1990 reply brief, the Government's opposition demonstrated that there were two Cayman Island bank accounts under the name of TMG Associates. One of those accounts was, however, opened by N.V., with N.V. funds, in order to act as a "Euro trading account." Third Strzegowski Declaration ¶ 15. Funds from this latter account were transferred on February 14, 1983, to another N.V. account and then used to purchase the 2329 Porter Street residence. *See id.* ¶ 16. In their supplemental reply brief, the Partnerships do not dispute this account. Instead, they present new evidence that the two TMG Associates accounts in the Cayman Islands were combined before the money used to purchase the 2323 Porter Street residence was transferred. On the basis of these facts, they ask the Court to enter summary judgment in their favor. The Government has not, however, had a chance to respond to this new evidence, nor indeed does it appear that the plaintiffs provided the Government with notice of this evidence during the additional discovery period. However, TMG's proffer of this evidence is so belated that it would be unfair to allow its submission. *See Cope v. McPherson,* 781 F.2d 207, 208 (D.C.Cir.1985).

### F.

Finally, plaintiffs rather perfunctorily contend that they can trace five other assets seized or recovered by the Government. In fact, however, they really contend that they do not need to trace these assets at all.

██ The primary asset at issue is the 2323 Porter Street residence. Noting that Markowitz had few assets before the Partnerships were formed, *see* Stipulation ¶ 4, plaintiffs contend that Markowitz must have used Partnership funds in order to satisfy the $496,171.00 purchase price. It is, however, stipulated that the residence was purchased with funds from Monetary Group, N.V. *See id.* ¶ 39. Moreover, it is also undisputed that in one month's trading with Hillcrest more than $500,000 in commissions were earned. *See id.* ¶ 6. So, it is more than possible that Markowitz paid for the house at 2323 Porter Street without using Partnership' funds. Given the evidence in the record, any assertion to the contrary is pure speculation insufficient to defeat defendant's motion for summary judgment. *See, e.g., Siegel v. Mazda Motor Corp.,* 878 F.2d 435, 439 (D.C.Cir.1989).

██ Along a similar vein, the Partnerships argue that Markowitz should be deemed to have purchased 2323 Porter Street, the minority interest in the Washington Capitals, and the Ford Bronco with Partnership funds under the doctrine of swollen assets. This doctrine is recognized in a few jurisdiction as an exception to the tracing requirement. *See Bogert on Trusts* § 922, at 375–77. It is not, however, applicable here. The swollen assets doctrine is based upon

> the theory that the use of trust funds to pay the personal debts of the trustee relieved him from using his individual property for that purpose and consequently increased the amount of it on hand at insolvency, and so it could be said that using trust funds to pay personal debts had "swelled" the assets on hand at the time of determining the rights of creditors and other claimants.

*Id.* at 376–77 (footnote omitted). The Partnerships do not allege that any debts were satisfied with Partnership funds. The swollen assets doctrine is, therefore, inapplicable.

██ Finally, the Partnerships argue that they can trace a transfer of $30,000 from Monetary Group, Ltd., to the Markowitz Stables account seized by the IRS. *See* Stipulation ¶ 31. Be that as it may, this fact does not establish their entitlement to those funds. The Monetary Group, Ltd., the general partner of TMG Associates, was owned by Edward Markowitz. There is nothing suspicious about Markowitz transferring money from a corporation to himself, and any claim that such funds include property of TMG Associates or TMG II is pure speculation, which

**54**

as mentioned above, is not sufficient to raise a genuine issue of fact.

## G.

In sum, although the Partnerships have been able to establish that Markowitz breached a fiduciary duty owed them, they have failed to establish that any of the assets seized or recovered by the Government are traceable to Partnership property. They have presented some evidence suggesting that the funds used to purchase the 2323 Porter Street residence can be traced into a TMG Associates bank account in the Cayman Islands, but that late emerging evidence is not cognizable at this stage of these marathon proceedings.

## VI.

 Finally, the Government contends that even if a constructive trust were declared by this Court over the 2323 Porter Street property, such a trust would not defeat its tax liens because the constructive trust was not "choate" at the time the tax liens were filed. Implicitly, the Government contends that a constructive trust is created when a court decided to enforce it. However, as Judge Sands convincingly argues, the better view is that the constructive trust arises "when the duty to make restitution arises, not when the duty is subsequently enforced." *United States v. Fontana*, 528 F.Supp. at 146 (quoting V *Scott on Trusts* § 462.4, at 3421). The Government concedes the validity of the *Fontana* decision but attempts to distinguish it. It argues that in a case of theft or embezzlement like *Fontana*, title never passes to the wrongdoer, but in the case of fraud, since the transferor in fact intends to pass legal title, the wrongdoer gains voidable title sufficient to allow a lien to attach. *See SEC v. Levine*, 881 F.2d 1165, 1174–76 (2d Cir.1989). This is a provocative argument. However, the Partnerships' theory, that a constructive trust was created by Markowitz's fraudulent representations, has more obvious failings. *See supra* p. 47. Moreover, even on its own terms it does not apply to the Partnerships' theory that Markowitz embezzled Partnership funds because, in such a case, Markowitz would not have gained even voidable title to that property. Accordingly, the Government's argument is now moot.

## VII.

For the reasons stated above, the accompanying order will enter summary judgment on behalf of the Government and dismiss plaintiffs' claims.